Chief Judge Fuld.
On the night of September 8, 1969, at about a quarter after nine, the defendant held up Paul DiG-eorge, an attendant at a gas station in Canastota, New York, and fled with his wallet and the station’s cash receipts, driving east on Route 5 in a Ford convertible. Notified of the incident, Officer Robert Mumford of the Sherill Police Department stopped the defendant’s car as he was driving through Sherill. While he and Police Chief Thomas Reilly were questioning the defendant, the latter suddenly produced a pistol and shot both officers. Reilly was able to radio in that he had been shot and that his assailant’s auto was heading east on Route 5; he also furnished the defendant’s last name and the car’s license number.
A little after ten o’clock, the defendant drove up to a trailer home, owned by Mrs. Marie DiLapi, about five miles from the scene of the shooting and, abandoning the Ford, forced her at gunpoint to drive him in her car to Syracuse. On the way, he threw a wallet out of the car—which was later found and identified as DiGeorge’s — and told Mrs. DiLapi that he had shot the two Sherill policemen and would kill her if she tried “ any funny stuff. ’ ’ After she dropped him off in the vicinity of Kennedy and South Salina Streets in Syracuse, she went immediately to the police.
*504 A check on the license number of the car in which the defendant was traveling disclosed that it belonged to a girl friend of his; that his full name was Martin Fitzpatrick; and that a person by that name owned a house at 1040 Midland Avenue, not far from where he had alighted from Mrs DiLapi’s vehicle. Shortly after 8:00 a.m. on the following day, police officers surrounded that house. When a knock, an announcement that they were police officers and a telephone call from next door produced no answer, the police, acting without a warrant, opened the door—which was ajar—went into the house and began searching for the defendant. As they entered a room on the second floor, the defendant called—from a closet in which he was hiding — ‘ ‘ Don’t shoot. I give up. ’ ’ The officers seized and handcuffed him, took him out into the hall, a few feet from the closet, and advised him of his rights. Questioned about the gun he had used, the defendant stated that it was on a shelf in the closet where they had found him. An immediate search of its interior uncovered a bank bag containing the gun, with six empty shell casings in the cylinder and 27 live rounds.
Officer Mumford died on September 9, 1969, the day after the shooting, and Chief Reilly four days later. The defendant was indicted for their murder in the Oneida County Court on October 6. In selecting the jury for trial, late in 1970, the district attorney challenged for cause 20 veniremen because of reservations about capital punishment —11 of whom had indicated, however, that their objection to the death penalty would not prevent them from returning a verdict of guilt. The prosecution also utilized a number of peremptory challenges to exclude other veniremen opposed to capital punishment.
At the subsequent suppression hearing, police officers testified that the Miranda warnings were given to the defendant. Sergeant Carhart stated that he “ was advised of his rights” and Lieutenant Burns declared that Carhart had given the suspect ‘ ‘ his rights, ’ ’ adding that the defendant, when asked if he was “sure” he understood his rights, replied in the affirmative. However, the judge decided, this testimony did not constitute ‘ ‘ sufficient information ’ ’ upon which he could find that “ the Miranda requirement was complied with * * * or that the defendant waived such rights.” Accordingly, he *505 ruled the defendant’s oral statements inadmissible. Nevertheless, concluding that the gun and the other items found in the closet could not be regarded, as the defense claimed, as “fruit of the poisonous tree,” the judge received them in evidence since, as he put it, [1] ‘ proper police investigation would [in any event] have resulted in a search of that closet and [their] discovery. ’ ’
Upon the trial, the defendant was identified by DiGeorge and Mrs. DiLapi, and at least two bullets used in the killings were proved to have come from the gun found in the closet. The jury returned a verdict of guilt on December 17, 1970. A few days later, prior to the commencement of what is commonly called the “ penalty trial ” (Penal Law, § 125.30), the defendant sought an adjournment to permit a psychiatric examination and the preparation of other relevant presentence material. The motion was denied. The defendant then decided to handle the penalty trial himself in place of his attorneys. After the People had concluded their case, he declined to call any witness or offer any evidence. The jury reported, on December 23, that it agreed that the death penalty should be imposed and, following imposition of that sentence, the defendant appealed to this court as of right (CPL 450.70).
Proof of the defendant’s guilt is clear and, indeed, he does not question its sufficiency. He does, however, contend, among other arguments, (1) that the trial judge committed error, requiring’ a reversal of the conviction and a new trial, when he received in evidence the gun and other articles found in the closet and (2) that, in any event, the United States Supreme Court’s decision in Furman v. Georgia (408 U. S. 238) compels annulment ¡of the death sentence imposed on the ground that, as the Eighth Amendment of the United States Constitution was construed in that case, such sentence amounts to cruel and unusual punishment.

Fruit of the Poisonous Tree

Contrary to the defendant’s contention, the gun and the other items may not be deemed inadmissible in evidence as fruit of the poisonous tree, that is, as the product of what the trial Judge ruled were improperly obtained statements.
There are, it is settled, exceptions to the rule that evidence is inadmissible if uncovered as a result of information obtained *506 by impermissible conduct on the part of police officers. (See, e.g., Wong Sun v. United States, 371 U. S. 471, 489; Nardone v. United States, 308 U. S. 338, 341 [where the connection between the lawless conduct of the police and the discovery of the challenged evidence had ‘ ‘ become so attenuated as to dissipate the taint ”]; Silverthorne Lbr. Co. v. United States, 251 U. S. 385, 392 [exclusionary rule has no application where government learns of the evidence “ from an independent source ”]; see, also, People v. Dentine, 21 N Y 2d 700, 971; United States v. Williams, 436 F. 2d 1166, 1170, cert. den. 402 U. S. 912; Payne v. United States, 294 F. 2d 723, cert. den. 368 U. S. 883.) As the Supreme Court wrote in Wong Sun v. United States (371 U. S. 471, 487-488, supra), “ We need not hold that all evidence is ‘ fruit of the poisonous tree ’ simply because it would not have come to light but for the illegal actions of the police. Bather, the more apt question in such a case is ‘ whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. ’ Maguire, Evidence of Guilt, 221 (1959).”
In line with this reasoning, the courts have held that evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence. (See, e.g., United States v. Seohnlein, 423 F. 2d 1051, cert. den. 399 U. S. 913; Wayne v. United States, 318 F. 2d 205, cert. den. 375 U. S. 860; People v. Regan, 30 A D 2d 983; People v. Soto, 55 Misc 2d 219; see, also, Lockridge v. Superior Ct. of Los Angeles County, 3 Cal. 3d 166, cert. den. 402 U. S. 910; Note 43 ALR 3d 385, 404; Maguire, How to Unpoison the Fruit, 55 J. Crim. L. C. & P. S. 307, 313-317; but cf. United States v. Paroutian, 299 F. 2d 486, 489 [319 F. 2d 661]; Pitler, “ Fruit of the Poisonous Tree ”, 56 Cal. L. Rev. 579, 627-630.) In other words, as one commentator put it, the inevitable discovery factor “ permits the government to remove the taint from otherwise poisoned fruit by establishing that the unlawful act from which it resulted *507 was not a sine qua non of its discovery.” (Maguire, How to Unpoison the Fruit, 55 J. Crim. L. C. & P. S. 307, 313.)
In the present case, it was entirely fortuitous that the police delayed the search of the immediate area where the defendant was discovered until they had begun questioning him and, as a result, very quickly learned where the gun was located. It is quite unreal to suggest that, but for the defendant’s admission, the police would not have looked for incriminating evidence in the closet where he had been hiding. The weapon, employed in a robbery and a shooting of two police officers, is a prime object of any investigation and, unless thrown away, was certain to be either on or near the defendant. If not found upon him, the next most reasonable place to look for it was where he had been just before he was seized. Since, then, a search of the closet was inevitable regardless of the defendant’s answers to questions put to him beyond its confines, it may not fairly be said that the police ‘ ‘ exploited. ’ ’ the ‘ ‘ illegality ’ ’ involved in their interrogation.
It has been suggested that the “ inevitable discovery ” exception may erode the “ exclusionary rule as a viable deterrent to. illicit police activity” (Pitler, “Fruit of the Poisonous Tree”, 56 Cal. L. Rev. 579, 630; see, also, United States v. Paroutian, 299 F. 2d 486, 489, supra), chiefly because it may not always be certain what the police would have done, clear as it may be what they could have or should have done. However, the exception may safely be applied — and erosion of the salutary exclusionary rule avoided—as long as the prosecution has the burden of proving “ that the illegal act was not a sine qua non of the discovery of the otherwise tainted evidence.” (Maguire, How to Unpoison the Fruit, 55 J. Crim. L. C. & P. S. 307, 317; see, also, Somer v. United States, 138 F. 2d 790, 792.) The “sine qua non test,” Maguire continued (ibid.), “if properly administered, serves well the raison d’etre of the exclusionary rule by denying to the government the use of evidence ‘ come at by the exploitation of . . . illegality ’ and at the same time minimizes the opportunity for the defendant to receive an undeserved and socially undesirable bonanza.” In the case before us, the defendant is clearly not entitled to have the gun suppressed, for, as indicated, the People have here unques *508 tionably met their burden of proving that the gun would inevitably have been located in the course of the police officers’ investigation.

The Legality of the Search and- Seizure

The defendant, however, goes on to argue, first, that, even assuming the validity of the 6 ‘ inevitable discovery ’ ’ exception and the lawfulness of his arrest, the seizure of the gun violated constitutional demands because it was not within the area from which he “might obtain weapons or evidentiary items ” as prescribed by Chimel v. California (395 U. S. 752, 766). And, second, he maintains that the gun should have been excluded because the entry, search and seizure — and even the arrest—were unconstitional because accomplished without a search or arrest warrant and without probable cause to believe that the defendant was within the house. . The arguments lack substance.
In the Chimel case (395 U. S. 752, supra), the court held that the lawful arrest of an accused, where effected without an arrest warrant, or a warrant to search the area where he is found, permits a search only of his person and the area from which he £ ‘ might obtain weapons or evidentiary items” (395 U. S., at p. 766). Since he had been removed from the closet’s interior, the defendant urges that he was outside the authorized “ grabbable ” area. Nothing in Chimel requires so narrow a reading of the Fourth Amendment. The court did not disapprove of a search of the “room” or area where the “ arrest occurs ” (p. 763); it condemned only a search “ £ remote in time or place from the arrest ’ ” (p. 764). The immediate search of the very closet where the defendant was arrested is far different from the proscribed search of “ closed or concealed areas ” (p. 763), even in the room where a defendant is arrested. There was here no quality of 11 rummaging at will ’ ’ among the defendant’s effects at which the Fourth Amendment is aimed (p. 767). And the fact that the police had handcuffed the defendant did not render the closet search unauthorized. As this court remarked in People v. Floyd (26 N Y 2d 558, 563), “it is not at all clear that the ‘ grabbing distance ’ authorized in the Chimel case is conditioned upon the arrested person’s continued capacity 1 to grab’,”
*509 Nor was there need in this case for a search or arrest warrant. The shootings by a man named Fitzpatrick, whose car had been identified as belonging to a friend of ‘ ‘ Martin Fitzpatrick ’ ’ and whose trail led close to a house owned by a man of that same name, as well as the defendant’s incriminating words of surrender just before the officers found him in the closet— all these gave the police more than sufficient ‘ ‘ probable cause ” to arrest him. Moreover, the “permissible scope of search ” must be at least “ as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape.” (Warden v. Hayden, 387 U. S. 294, 299.) “The Fourth Amendment does not require police officers to delay in the course of an investigation ”, the court declared in the Say den case, “ if to do so would gravely endanger their lives or the lives of others. Speed here was essential ” (387 U. S., at pp. 298-299). It was just as essential in the present case, despite the passage of some hours since the shootings had occurred. Those hours were undoubtedly spent in interviewing DiG-eorge and Mrs. DiLapi, in checking on the car, learning the defendant’s identity, ascertaining the location of the house he owned and where he was likely to go. It was certainly not unreasonable for the police to believe that he would conceal himself, as he actually did, in the house which he owned and in whose vicinity he had last been seen. The circumstances demanded that they act quickly. He had fatally wounded two persons, had threatened the life of a third and was known to be armed. Proper police procedures, as well as elementary considerations of prudence, required the officers to enter and search the house for him in order to prevent his escaping and endangering the lives of others. Accordingly, no constitutional rights of the defendant were violated by the warrantless entry, search and arrest.

The Death Sentence as Cruel and Unusual Punishment

Section 125.30 of the Penal Law provides that a defendant shall be sentenced to death following a jury verdict convicting him of murder if, after a further “ proceeding ”, the jury unanimously agrees “on the imposition of the penalty of death” (Penal Law, § 125.35) and the court is “ satisfied” that the “ victim of the crime was a peace officer who was killed in the *510 course of performing Ms official duties ” (Penal Law, § 125.30, subd. 1, par. [a], cl. [i]). Following the presentation of evidence at the “ penalty trial ” and the court’s charge to the jury, that body retires “to consider the penalty to be imposed”. And, continues subdivision 5 of section 125.35,
“ If the jury report unanimous agreement on the imposition of the penalty of death, the court shall discharge the jury and shall impose the sentence of death. If the jury report unanimous agreement on the imposition of the sentence of imprisonment, the court shall discharge the jury and shall impose such sentence. If, after the lapse of such time as the court deems reasonable, the jury report themselves unable to agree, the court shall discharge the jury and shall, ih its discretion, either impanel a new jury to determine the sentence or impose the sentence of imprisonment.”
As a reading of that provision makes clear, whether the death sentence is to be imposed rests in the discretion of the jury, and, as already indicated, we must say whether Furman v. Georgia (408 U. S. 238, supra) requires a decision that that penalty constitutes “ cruel and unusual punishment ” under the Eighth Amendment as interpreted by the Supreme Court.
The defendants in the three separate cases dealt with in Furman, were sentenced to death, following trials by juries, one for murder and two for rape.[1] In each instance, the state legislature left the determination whether the penalty should be death or some lighter punishment to the discretion of the judge or the jury.
Of the members of the court comprising the majority in Furman, only two— Mr. Justice Brennan (408 U. S., at pp. 257-306) and Mr. Justice Marshall (pp. 314-371)—concluded that the infliction of the death penalty constitutes ' ‘ cruel and unusual punishment ” and that, consequently, the Eighth Amendment prohibits capital punishment for all crimes and under all circumstances. The other three justices, who concurred in the court’s judgments of reversal, found it unnecessary to reach that “ ultimate question ” (per Stewart, J., p. 306). Instead, point *511 ing out that in each of the cases before the court, the legislature had not itself mandated the death penalty, they held impermissible the practice of committing to the untrammeled discretion of a jury the power to pronounce life or death. (See, e.g., Note, The Supreme Court, 1971 Term, 86 Harv. L. Rev., at p. 76 et seq.) Note, 47 St. John’s L. Rev. 107.) Mr. Justice Douglas condemned ‘£ a system of law and of justice that leaves to the uncontrolled discretion of judges or juries the determination whether defendants ■ * * * should die or be imprisoned. Under these laws no standards govern the selection of the penalty. People live or die, dependent on the whim of one man or of 12 ” (408 U. S., at p. 253). Thus, concluded Justice Douglas, “ these discretionary statutes are unconstitutional in their operation. They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on ‘cruel and unusual’ punishments” (pp. 256-257). Mr. Justice Stewabt was also of the view that the sentencing practices provided by the statutes in question—vesting juries or judges with discretion to determine whether the penalty should be death or life imprisonment—offend against the prohibition of the Eighth Amendment. “ [T]he death sentences now before us ”, wrote Justice Stewabt (pp. 309-310), “ are the product of a legal system that brings them * * * within the very core of the Eighth Amendment’s guarantee against cruel and unusual punishments, a guarantee applicable against the States through the Fourteenth Amendment. Robinson v. California, 370 U. S. 660. In the first place, it is clear that these sentences are ‘ cruel ’ in the sense that they excessively go beyond, not in degree but in kind, the punishments that the state legislatures have determined to be necessary. Weems v. United States, 217 U. S. 349. * * * I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.” And Mr. Justice White — addressing himself to the question whether capital punishment statutes are unconstitutional when ‘ ‘ the legislature does not itself mandate the penalty in any particular class or kind of case (that is, legislative will is not frustrated if the penalty is never imposed), but delegates to judges or juries the decisions as to those cases, if- any, in which the penalty will be *512 utilized ’ ’ (p. 311)—reached the conclusion that “ the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not” (p. 313). In short, added Justice White, ‘ ' past and present legislative judgment with respect to the death penalty loses much of its force when viewed in light of the recurring practice of delegating sentencing authority to the jury and the fact that a jury, in its own discretion and without violating its trust or any statutory policy, may refuse to impose the death penalty no matter what the circumstances of the crime. Legislative ' policy ’ is thus necessarily defined not by what is legislatively authorized but by what juries and judges do in exercising the discretion so regularly conferred upon them. In my judgment what was done in these cases violated the Eighth Amendment ” (p. 314).[2]
Since, then, the New York statute here challenged (Penal Law, § 125.35, subd. 5) leaves infliction of the death penalty solely to the discretion of the jury, we conclude, in light of the Supreme Court’s reading of the Eighth Amendment in Furman (408 U. S. 238, supra), that we have no alternative hut to hold that that penalty constitutes cruel and unusual punishment within *513 the sense of that provision. The circumstance that the penalty is limited to those found guilty of killing police and other peace officers is irrelevant; it does not alter or affect the fact that the Legislature, instead of providing mandatory death sentences for all defendants who kill police officers, has vested juries with a discretion to decide, case by case, whether that ultimate punishment should be inflicted.[3]
The judgment appealed from should be modified by vacating the sentence of death and remitting the case to the Oneida County Court for resentencing, and, as so modified, the judgment should be affirmed.

. The three cases — entitled, in the Supreme Court, Furman v. Georgia, Jackson v. Georgia and Branch v. Texas—may be found, respectively, in the Reports of those jurisdictions in 225 Ga. 253, 225 Ga. 790 and 447 S. W. 2d 932.

. In sharp contrast, Chief Justice Burger, in the course of his dissenting opinion, stated, in effect, that, if constitutionality turned on whether the legislature provided mandatory death sentences “in such a way as to deny juries the opportunity to bring in a verdict on a lesser charge * * “ I would have preferred that the Court opt for total abolition” (408 U. S., at p. 401). “I could more easily be persuaded ”, continued the Chief Justice (pp. 402-403), “that mandatory sentences of death, without the intervening and ameliorating impact of lay jurors, are so arbitrary and doctrinaire that they violate the Constitution * *' * I had thought that nothing was clearer in history, as we noted in McGaufha [v. California, 402 U. S. 183] one year ago, than the American abhorrence of 'the common-law rule imposing a mandatory death sentence on all convicted murderers.’ 402 U. S., at 198. ° * * If anywhere in the whole spectrum of criminal justice fresh ideas deserve sober analysis, the sentencing and correctional area ranks high on the list. But it has been widely accepted that mandatory sentences for crimes do not best serve the ends of the criminal justice system. Now, after the long process of drawing away from the blind imposition of uniform sentences for every person convicted of a particular offense, we are confronted with an argument perhaps implying that only the legislatures may determine that a sentence of death is appropriate, without the intervening evaluation of jurors or judges.”

. In this view, we find it unnecessary to consider the defendant’s additional contentions relating (1) to the exclusion from the jury of jurors opposed to capital punishment and (2) to the denial of his application for an adjournment of the penalty trial pending his psychiatric examination and the preparation of evidence to support his plea for a sentence of imprisonment.