**Theresa SIMMONS, Petitioner-Appellant,**

**v.**

**Frances CLEMENTE, Superintendent, Bedford Hills Correctional Facility, Bedford Hills, N. Y., Appellee.**

**No. 550, Docket 76–2117.**

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1977.

Decided March 24, 1977.

Harry I. Subin, New York City, for petitioner-appellant.

David Rapaport, Asst. Dist. Atty., New York County, New York City, (Robert M. Morgenthau, Dist. Atty., and Peter L. Zimroth, Asst. Dist. Atty., New York County, New York City, on the brief), for appellee.

Before ANDERSON, OAKES and GURFEIN, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

On the night of January 13, 1966, in New York City, Theresa Simmons and her accomplice, Peggy Barbour, hailed a cab driven by Martin Seiler and rode in it to within a few blocks of Simmons' home. Simmons told Seiler to stop the car, grabbed him around the neck and placed a .22 caliber revolver to his head. Barbour removed the car keys from the ignition. In the resulting struggle, Simmons fatally shot Seiler through the neck. The bullet then passed through Simmons' arm. The two women fled to Simmons' apartment, which she shared with her brother, Nathaniel, and her sister, Constance. After Peggy Barbour threw the ignition keys onto the roof of the apartment, she accompanied Simmons and Constance to Harlem Hospital to obtain treatment for Simmons' wound.

The body of Martin Seiler had already been brought to the Hospital and examined by Dr. Gladstone Hodge, who determined that Seiler had been shot through the neck by a small caliber bullet. Dr. Hodge also examined Simmons shortly thereafter and determined that she too had been shot by "approximately a .22 caliber bullet." Simmons initially told the doctor that she had caught her arm in a door but later admitted that she had been shot. Dr. Hodge called the similarity of Simmons' and Seiler's wounds to the attention of a patrolman on duty at the Hospital who questioned Simmons and relayed the information to the police detectives recently arrived at the Hospital to investigate the case. The detectives in turn questioned Simmons and then took her into custody, taking her and her sister to the station house, where they were joined by Simmons' brother. At the station house, the police learned that Simmons had given them a false name and address. Nathaniel Simmons consented to a search of the apartment he shared with his sisters. The search resulted in the discovery of the murder weapon.

After Simmons was told by the police that they had the gun, she orally made incriminating statements to them and later gave a written statement to Assistant District Attorney Thomas J. Hughes in which she admitted that she shot Martin Seiler. The statement was elicited without the full benefit of warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because at the time of the questioning that case had not yet been decided. Assistant District Attorney Hughes had told Simmons, however, at the beginning of her statement that "you don't have to talk to me if you don't want to" and that anything she did say "might later be used in evidence." In her statement, Simmons identified her accomplice only as "Peggy," and denied that she knew Peggy's last name.

On the next day, January 14, 1966, Peggy Barbour was picked-up by the police and, after a limited form of *Miranda* warnings, she also gave a statement to Assistant District Attorney Hughes in which she detailed the robbery and murder and confirmed that Simmons had placed the gun to the cab driver's head. She also admitted discarding the cab keys on the roof of the apartment building.

Simmons and Barbour were indicted on first degree murder charges. Peggy Barbour was allowed to plead guilty to second degree manslaughter but with the understanding that she would testify at Simmons' trial if necessary. Barbour's sentencing was postponed pending the outcome of Simmons' case.

Barbour testified against her accomplice at trial without objection by the defense. Simmons' counsel did object, however, to the use of statements made by Simmons to Officer Leslie at Harlem Hospital on the basis of *Miranda v. Arizona, supra,* contending that Simmons was in custody at the time. The trial court held a hearing pursuant to *People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), on the voluntariness and admissibility of these statements and ruled that Simmons had not been in custody at the time she talked with Officer Leslie at Harlem Hospital and that her statements were, therefore, admissible. Simmons took the stand on her own behalf and, after the trial judge had made a find-

ing that the statement she had made to Assistant District Attorney Hughes had not been coerced, it was used on her cross-examination, over the objection of her counsel, but solely for the limited purpose of impeaching her credibility. The evidence of Simmons' prior statements was so limited because by the time of the trial the decision in *Miranda v. Arizona* had become applicable to the present case because the trial of the instant case did not begin until *after* June 13, 1966, the date on which the *Miranda* decision was filed. *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Simmons was found guilty on January 25, 1967 and was thereafter sentenced to the term of her natural life. On appeal of her conviction, the two major issues raised were that the murder weapon had been uncovered through an illegal search of her apartment and that she had been improperly cross-examined and impeached through the statement made to Assistant District Attorney Hughes. The Appellate Division affirmed the conviction without an opinion, *People v. Simmons*, 32 A.D.2d 1029, 301 N.Y.S.2d 954 (1st Dept. 1969). Leave to appeal to the New York Court of Appeals was not sought.

In 1973 Simmons retained new counsel and through an application in the nature of a writ of error *coram nobis* brought in Supreme Court, New York County, sought to have her judgment of conviction set aside. The same judge who presided over her original trial denied this motion on September 24, 1973. The judge noted in his opinion that Simmons' prime argument in seeking to vacate the conviction was that "the material evidence adduced at trial," namely Peggy Barbour's name and existence, "was tainted with illegality" because the police interrogation had not been prefaced with the required *Miranda* warnings, and thus, the "fruit of the poisonous tree" doctrine, as developed in *Silverthorne Lumber Company, Inc. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), barred the admis-

sibility of Barbour's live testimony. The state judge disagreed with Simmons' contention, and held that the "fruit of the poisonous tree" doctrine was inapplicable where in the normal course, the police investigation, even absent the illicit conduct, would have inevitably led to such evidence, *People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 797, 300 N.E.2d 139 (1973). In Simmons' case, the court found that the police had legally obtained the murder weapon through a consensual search of the Simmons' apartment, with permission of Simmons' brother Nathaniel, and that the discovery of the gun "would have triggered further inquiry and resulted in the eventual identification of [Peggy Barbour] . .." The court's dismissal of Simmons' application for a writ of error *coram nobis* was affirmed without opinion by the Appellate Division, *People v. Simmons*, 46 A.D.2d 743, 360 N.Y.S.2d 841 (1974), and leave to appeal to the New York Court of Appeals was denied on December 12, 1974.

Simmons thereafter filed the instant petition for a writ of habeas corpus in the district court, which interpreted her argument to be that the use of Barbour's testimony violated Simmons' rights under the Fifth and Sixth Amendments "in that Barbour's identity was discovered during an unconstitutional interrogation of petitioner which took place after an arrest not supported by probable cause." After a review of Simmons' "fruit of the poisonous tree" argument, in the light of the standards set down by *Wong Sun v. United States, supra,* and related cases in this Circuit, including *United States v. Karathanos*, 531 F.2d 26 (2d Cir.), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 3221 (1976), and *United States v. Tane*, 329 F.2d 848 (2d Cir. 1964), the court found that Barbour's decision to testify was an "independent act of free will" which sufficiently purged the taint of the assumed illegal arrest. This appeal followed.

On appeal, Simmons disputes the district court's conclusion that Barbour's testimony was given as a result of an independent act of free will. Simmons reasserts her Fourth

Amendment claim that the police lacked probable cause to arrest her at Harlem Hospital and that all evidence obtained as a result of that arrest, including her responses to police interrogation which allegedly led the police to Peggy Barbour and the latter's testimony at Simmons' trial, should have been excluded as "fruits of the poisonous tree." Petitioner also contends that for purposes of the recent Supreme Court opinion in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), she was not afforded "opportunity for full and fair litigation of her claim," even though she concedes that the Supreme Court, New York County, "reached the merits of appellant's Fourth Amendment claim" in denying the 1973 motion to vacate the conviction. She goes on to argue that the district court erred in not holding an evidentiary hearing on her "fruit of the poisonous tree" allegations.

At the heart of this case is the applicability of *Stone v. Powell, supra,* to the instant petition. In *Stone* the Court considered "Whether a federal court should consider, in ruling on a petition for habeas corpus relief filed by a state prisoner, a claim that evidence obtained by an unconstitutional search or seizure was introduced at his trial, when he has previously been afforded an opportunity for full and fair litigation of his claims in the State courts." 428 U.S. at 469, 96 S.Ct. at 3039. One of the petitioners in *Stone,* Lloyd Powell, had been convicted of murder in a California state court after he was arrested pursuant to a vagrancy ordinance, the constitutionality of which he challenged. In a search incident to the arrest, the police had discovered a .38 caliber revolver. The issue of the vagrancy ordinance's constitutionality was duly presented to the trial court and the California District Court of Appeal, which found it unnecessary to pass upon the legality of the arrest and search. Powell was denied habeas corpus relief by the Supreme Court of California, as well as federal habeas corpus relief by the District Court for the Northern District of California. The Ninth Circuit Court of Appeals, however, reversed the denial of relief, 507 F.2d 93 (9th Cir. 1974). The other *Stone* petitioner, David Rice, was also convicted of murder, allegedly on the basis of an illegal search. Rice had unsuccessfully moved to suppress the evidence at trial, a ruling affirmed by the Supreme Court of Nebraska on appeal. The District Court for the District of Nebraska granted habeas corpus relief on the grounds that the search warrant in question was invalid, a judgment affirmed by the Eighth Circuit, *Rice v. Wolff,* 513 F.2d 1280 (8th Cir. 1975). After a lengthy review of the exclusionary rule and collateral review of Fourth Amendment claims, the Supreme Court concluded that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim . . ." state prisoners could not be granted federal habeas corpus relief. 428 U.S. at 494, 96 S.Ct. at 3052 (footnote omitted).

The issue presented here, then, as to Simmons' Fourth Amendment claim of an allegedly illegal arrest resulting in a tainted confession and thereby to the equally tainted testimony of Peggy Barbour, is whether the State of New York has provided a "full and fair opportunity" to litigate this question.

■ Simmons has conceded that the merits of her Fourth Amendment claim were reached by the New York Supreme Court Justice in the 1973 proceeding to vacate her conviction. This same judge presided at her 1967 trial, and made findings of fact both in 1967 and 1973 which were fairly supported by the record. In 1973, for example, he found that the police would have inevitably discovered the existence and identity of Simmons' accomplice after the discovery of the gun in petitioner's apartment. Whether the 1966 search of Simmons' apartment was consensual or not, was in turn the subject of a lengthy evidentiary hearing at Simmons' 1967 trial pursuant to a defense motion to suppress the gun. New York Supreme Court Justice Davidson heard the testimony of both Nathaniel Simmons and Detective Leo Kitchman, who requested permission to search

the apartment, and thereafter found "beyond a reasonable doubt" that Nathaniel Simmons had given his consent to the search. There do not appear to be any "serious procedural errors" in the State Supreme Court's refusal to take testimony on Simmons' Fourth Amendment claim in 1973. It had before it the full 1967 trial minutes, in addition to affidavits from the petitioner and Peggy Barbour's counsel, Alfred Rosner. Moreover, as above noted, the same Justice who decided against petitioner's motion to vacate the conviction in 1973 presided over her original trial in 1967. Petitioner has not been able to point to a scintilla of newly discovered evidence bearing on the Fourth Amendment claim developed at the 1967 trial, including the events surrounding Simmons' detention at Harlem Hospital and the interrogation of her by the police at the station house. In connection with the questioning of the petitioner at the Hospital, it was pointed out at the beginning of this opinion that trial counsel made a motion in 1967 to exclude statements made by Simmons to the patrolman on duty at the Hospital on the date of the murder. The trial judge held a *Huntley* hearing and received the testimony of the patrolman on duty and Sergeant Michael Stanise, who also had questioned Simmons at the Hospital. The defense's contention at that time was that petitioner's statements at the Hospital were made under custodial interrogation without benefit of *Miranda* warnings. In ruling on the 1973 motion to vacate the judgment, the State court had before it the full transcript of the *Huntley* hearing, which included the testimony taken close to the time of the relevant events. In short, to hold a further hearing at this late date when memories have faded, in order to ask substantially the same questions of the same people as testified at petitioner's 1967 trial, is itself unreasonable and not called for under *Stone v. Powell, supra.*

Unlike the case of *Gates v. Henderson* (2d Cir. Jan. 12, 1977) (slip op. 1345) *rehearing en banc granted* Mar. 7, 1977 in the present case the State court made comprehensive findings of fact supported by a full record when ruling on the *coram nobis* petition in 1973. Previously, it had likewise made findings after a full and fair hearing on the issues presented by the petitioner's current Fourth Amendment claim during the course of the 1967 trial.

Finally, while petitioner's argument on this appeal is directed at her Fourth Amendment claim, she makes mention of a Fifth Amendment claim, stemming from her interrogation at the station house without the benefit of *Miranda* warnings. To the extent that she is heard to argue that Barbour's testimony should have been suppressed as the poisoned fruit of Simmons' statement elicited without the benefit of full *Miranda* warnings, and thus obtained in violation of petitioner's Fifth Amendment privilege against self-incrimination, we hold that this argument must fail on the authority of *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). In *Tucker* an interrogation of a defendant without full *Miranda* warnings led the police to one Henderson, who eventually testified against the defendant in that case and discredited his account of the relevant events. As in the present case, Tucker's interrogation took place *before* the Supreme Court announced its *Miranda* decision, but *Miranda* was applicable to the trial of that case which started *after* the date on which *Miranda* was handed down. While the Court noted in *Tucker* that the exclusionary rule's deterrent purposes as applied in a search and seizure setting, "would seem applicable to the Fifth Amendment context as well" in a "proper case," 417 U.S. at 446–47, 94 S.Ct. 2357, 2365, it held that given the circumstances of Tucker's interrogation (prior to the announcement of *Miranda*) and the minimal deterrent effect on further police conduct from exclusion of Henderson's testimony, 417 U.S. at 448, 94 S.Ct. 2357, the district court was in error in granting habeas corpus relief and ruling Henderson's testimony inadmissible. Likewise here, Simmons was interrogated by the police and Assistant District Attorney Hughes before the announcement of *Miranda*. Further, there is no evidence of bad faith in the police interrogation; indeed, Assistant Dis-

**70**

trict Attorney Hughes informed both Simmons and Barbour before taking their statements at the station house that "you don't have to talk to me [Hughes]," but that anything they said "might later be used in evidence." In light of the above facts and the reasoning of *Tucker, supra,* petitioner's "fruit of the poisoned tree" argument as it relates to Fifth Amendment violations must also fail.

We, therefore, affirm the dismissal of petitioner's application for a writ of habeas corpus, but express no opinion on the merits of her contentions.