Wachtler, J.
(dissenting). For the reasons stated by Judge Cooke in his dissenting opinion I too would hold that the police need a warrant to enter a home in order to arrest or seize a person, unless there are exigent circumstances. Thus in the Riddick case where there was no exigency I would reverse, suppress the evidence and dismiss the indictment. In the Payton case I would reach substantially the same result as Judge Cooke proposes, but for somewhat different reasons.
Initially it seems to me that in the Payton case the circumstances were sufficiently compelling to permit the police to enter the defendant’s apartment to arrest him without a warrant. The record shows that from the time of the murder the police had actively sought the killer. As a result of their continuous and intensive investigation they soon identified the defendant, two days after the crime, and early the following morning went to his apartment. There they observed a light shining beneath the door and heard a radio playing. Thus for several days the police had been in continuous pursuit of the killer when they arrived at the defendant’s apartment, where they had reason to believe he might be hiding, particularly in view of their observations at the scene. Under these circumstances I believe it was reasonable for the police to continue their pursuit into the apartment in order to take a dangerous killer into custody (cf. People v Fitzpatrick, 32 NY2d 499, 509).
But the right to enter for the limited purpose of arresting the defendant did not justify a full-scale search of the defendant’s apartment for evidence of the crime. The People commendably admitted this at the hearing and the court suppressed all of the evidence seized, except for the shell casing which was found in plain view. I agree with that determina *316 tion. But I cannot agree with the court’s further holding that certain fruits of the illegal search — namely, the records of a Peekskill gun dealer whose name appeared on a receipt seized during the seach — was properly admissible under the so-called "inevitable discovery” doctrine, on the theory that the police would have discovered this evidence in any event through normal police procedures.
The inevitable discovery doctrine is unrealistic in the purest sense. It permits the court to ignore what really happened and to rely instead on hypothesis. In this case for instance the police admitted that they did, indeed, obtain the gun shop records as a direct result of the illegal seizure of the gun receipt and that the evidence was therefore a classic example of poisoned fruit. Nevertheless ignoring the reality of the direct connection the court held that the evidence was not tainted because the police would, or should, have obtained it in the normal course of their investigation although they had made no effort to do so.
Apart from being completely unrelated to what really happened, this determination must, on the facts of this case, rest on pure conjecture. Without the receipt the only information the police had which could have led them to the record of the gun sale was a statement from the defendant’s friend and hunting companion that the defendant had purchased a weapon, similar to the one sought, in "upstate New York” in November, 1969. Furthermore, although it was noted that the Federal Government requires gun dealers to make a record of their sales, it was conceded that these records are not sent to any central repository. Thus the police could not obtain a record of the sale from the Federal Government. The Federal authorities could only furnish a list of all registered gun dealers in the State. The police would then have to contact every dealer individually to see if a record had been made and was still available.
At the hearing one of the officers testified that at the time there were approximately 1,100 gun dealers registered in the State. The record does not indicate how many of these dealers were located in the New York City area, which presumably could have been eliminated from the search. But even eliminating these dealers the task of locating the record of the sale would have involved a considerable effort. In fact it would have involved such an effort that the police officers themselves admitted that they could not recall a single instance where an *317 investigation of this nature and magnitude had been undertaken. Of course they had not actually employed this approach in this case. Thus the determination that the police would have discovered the sale record in the normal course of their investigation, through communications with gun dealers, does not rest on experience, nor does it even rest on proof of a normal police procedure. As far as this record shows this type of investigation was neither tried nor proven and would have been quite extraordinary.
This is not the type of inevitability which was contemplated in Fitzpatrick (supra, at p 507) where the court repeatedly noted that discovery of the evidence was "certain” and the police had only to look in "the next most reasonable place”. Here there were literally hundreds of reasonable places to look, most of which were widely scattered throughout the State.
Apparently the majority recognizes the difficulty of holding that the police would have inevitably prevailed in the face of so many obstacles. Accordingly they have redefined the inevitable discovery doctrine by holding that it does not actually require "certitude” as the term itself implies, and as we held in Fitzpatrick. It simply requires "a very high degree of probability that the evidence in question would have been obtained independently of the tainted source.” Now apparently the only thing inevitable about the inevitable discovery doctrine is that the police with the benefit of hindsight, will inevitably be able to show that they could have obtained the evidence lawfully by employing some other technique, no matter how hypothetical and no matter how involved of extraordinary resort to the procedure would have been.
This type of reasoning can only serve to erode the exclusionary rule. In many, if not most cases, the police will undoubtedly be able to point to some lead which if pursued with fanatical devotion would have ultimately led them to the evidence which was actually obtained unlawfully. Unfortunately it is in cases where the evidence could have been obtained through lawful, but time-consuming methods that the exclusionary rule is most needed to discourage the police from resorting to the unconstitutional short cut (see Fitter, Fruit of the Poisonous Tree, 56 Cal L Rev 579, 630; see, also, People v Gonzalez, 39 NY2d 122, 131).
The mischief caused by the "inevitable” or "very highly probable” discovery doctrine is well illustrated in the case now before us. Here the majority has held that the police may *318 enter a home without a warrant to make an arrest although they concededly could not have entered to make a search. The theory is that an entry to arrest is less intrusive than a search because it does not involve a wholesale rummaging through the individual’s belongings. Yet, despite the fact that the police did in fact completely rummage through the defendant’s apartment and belongings after entering to make the arrest, the majority holds that the police should not be deprived of the illegal fruits because the evidence would have been discovered in any event in the normal course of the police investigation. This decision can hardly be expected to discourage the police from completely searching the premises for evidence after entering for the "limited” purpose of making an arrest. Thus in this case the inevitable discovery doctrine has even undermined the basic premise on which the majority relies to support its conclusion that an entry to make an arrest is significantly different from an entry to search for evidence.
Accordingly, in the Payton case, I would reverse and suppress all evidence of the purchase of the weapon.