People v Lindsey (2004 NY Slip Op 50395(U))

[*1]

People v Lindsey

2004 NY Slip Op 50395(U)

Decided on February 6, 2004

Supreme Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 6, 2004

Supreme Court, Kings County
 THE PEOPLE OF THE STATE OF NEW YORK
against
SHAWN LINDSEY, Defendant.
INDICTMENT NO. 3891/2003

The attorneys on the case were A.D.A. Caryn Gerst, Office of the Kings County District Attorney, 350 Jay Street, Brooklyn NY 11201 (718-250-4876) and Darren Fields, Esq., 26 Court Street, Brooklyn NY 11242 (718-237-7103).

Albert Tomei, J.
The defendant, Shawn Lindsey, charged with criminal possession of a controlled substance in the second degree, moves to suppress physical evidence and statements. The court conducted an evidentiary hearing on defendant's Dunaway/Mapp/Huntley motions. Detectives Adam Frasse, Anderson Saint John, and Joseph Sallustio testified for the People. Patrice Roper and defendant Shawn Lindsey testified for the defense. To the extent that the witnesses' testimony conflicted, I credit the testimony of the People's witnesses. Based on the credible evidence, the court makes the following findings of fact and conclusions of law:
Findings of Fact
Detective Adam Frasse was assigned to investigate the shooting of Miguel Perez which occurred on April 2, 2001, at approximately 9:40 p.m. at 125 Nostrand Avenue in Brooklyn. Perez stated in a hospital interview that he could not identify the shooter. The police had no suspects until April 30, 2003, when an anonymous informant, under arrest for another crime, told Detective Frasse that the shooter was one of the Smith brothers, nicknamed "Turtle," and was a 5'6" tall, 130 lbs., black man, with braided hair. The informant looked at photo books and identified a photo of the defendant, Shawn Lindsey, a.k.a. Devon Smith. Detective Frasse created a six photo array containing the defendant's photograph and showed it to Perez at the hospital on May 3, 2003. Perez identified the defendant as the shooter, and said that he was known as "Turtle" and lived at 121 Nostrand Avenue.
After Perez's identification, the police began looking for the defendant by canvassing addresses he was known to frequent, including 86 Halsey Street, the home of Patrice Roper, the defendant's girlfriend and the mother of his school-aged child. On May 28 and 29, 2003, Detectives Anderson Saint John, Joseph Sallustio, and Whitehall conducted surveillance at 86 Halsey Street, in an unmarked car, looking for Roper or the defendant. The detectives did not know what Roper looked like, except that she was a black woman about 5' 6" tall, so they followed every black woman who left the building with a school-aged child. On May 28, 2003, they followed two women who they eventually determined were not Roper.
[*2]
At approximately 8:15 a.m. on May 29, 2003, they followed a third woman with a child form 86 Halsey Street to a nearby school, where she dropped off the child. As the woman was walking back towards Halsey Street, a gray Infiniti automobile pulled up to her and she got inside. Detective Saint John saw that the driver was a short black man and concluded that he might be the defendant, but was not sure because he had no opportunity to see the driver's face. The detective was carrying a photograph of the defendant so that he could recognize him on sight.
The detectives followed the Infiniti for several blocks until they reached a location where its forward movement was about to be impeded by a van double-parked in its lane. They activated their lights and siren to notify the driver to stop. As the driver complied, Detective Saint John pulled the police car along side the Infiniti to block the car from moving into the other traffic lane. As he did so, he saw the driver's face, and recognized the driver to be the defendant. Detective Saint John told the defendant to turn off the car and take the key out of the ignition. The detective then backed the police car up so that Detective Sallustio could open his door and get out.
Detective Saint John remained in the police car and watched as Detectives Sallustio and Whitehall approached the defendant's car. Detective Saint John saw the defendant remove his coat and put it on the back of his seat. Officer Sallustio told the defendant to step out of the car, which he did, leaving his coat in the car. The defendant was taken to the rear of his car, where he was patted down and handcuffed. Approximately $1,296 was found on his person.
Meanwhile, because he was aware that the defendant had shot his victim and that there was a passenger still in the car, Detective Saint John decided to conduct a protective search of the defendant's coat to look for the gun. He removed the jacket from the back of the driver's seat, and searched the pockets, finding a large quantity of cocaine, but no weapon. At this point, Ms. Roper was removed from the car and arrested.
When Ms. Roper was arrested, the defendant said "Let her go. She has nothing to do with this, whatever you got in the jacket is mine." Detective Saint John told the defendant to calm down and that everything would be sorted out at the precinct. The defendant was taken to the precinct, arriving at approximately 9:30 a.m., where he was met by Detective Frasse. The apprehending detectives gave Detective Frasse the defendant's jacket, the drugs and the money, and reported the defendant's statement.
The defendant was then taken to an interview room by Detective Frasse, searched and asked for pedigree information. During the search, the defendant stated that the drugs were all his and that his wife had nothing to do with it. At approximately 11:30 a.m., Detective Frasse administered the Miranda warnings to the defendant, who waived his rights and agreed to make a statement. The defendant then gave oral and written statements in which he denied any knowledge of the shooting incident, but reiterated that the drugs were his and that Ms. Roper had nothing to do with them. The statement was signed at 12:40 p.m.
At approximately 2:15 p.m., the defendant's attorney came to the precinct and spoke with the defendant. He then spoke with Detective Frasse an instructed him not to speak further with the defendant. After the attorney left the precinct, the defendant was placed in a holding cell in the Detective's Squad. While Detective Frasse was sitting at his desk vouchering the evidence, the defendant told him to be careful with the jacket because it was Prada. He was [*3]not asked any questions prior to this statement.[FN1]
The defendant and Roper both testified that the defendant picked her up that morning intending to take her shopping on Gates Avenue for a vacation cruise on which Roper was to leave that afternoon. They alleged that the defendant intended to give Roper a sum of money as a graduation present to spend on the cruise.
Conclusions of Law Defendant claims that the drugs, the money, and his statements must be suppressed because he was seized without probable cause and all of the evidence was a fruit of that illegal conduct. The People oppose this motion, arguing that the stop was lawful, the physical evidence was discovered pursuant to proper police procedures, and that the statements were either spontaneous or made after properly administered Miranda warnings. The People further argue that, even if the stop was unlawful, the court should find, under the doctrine of inevitable discovery, that the drugs and statements are admissible at trial.
There can be no doubt that probable cause to arrest defendant arose from the victim's identification of defendant's photograph as that of the person who shot him. See People v Mitchell, 170 AD2d 542 (2d Dept. 1991). There was nothing suggestive or improper about the identification procedure in this case. The detective who showed the array to the victim in no way indicated that the victim was required to make an identification, nor did the suggest which person the victim should identify. Moreover, the array was not suggestive in composition. Therefore the photo identification was entirely proper and gave the police probable cause to believe that the defendant had committed a crime.
In this case, however, the fact that the police had probable cause to arrest the defendant does not automatically establish a lawful right to stop the car. A car stop is a seizure of the persons occupying the car. People v. Spencer, 84 NY2d 749, 752 (1995). A stop may not be made on a "whim, caprice, or idle curiosity" or on a hunch that criminal activity is afoot or that a known criminal may be inside the car. See People v. Ingle, 36 NY2d 413, 418 (1975); People v. May, 81 NY2d 725 (1992). Rather, before the police may lawfully stop a car and seize its occupants, they must have at least a reasonable suspicion that the car or one of its occupants are, were, or will be involved in a crime. People v. Spencer, 84 NY2d at 752-753; People v. May, 81 NY2d at 727. Reasonable suspicion has been defined as: "that quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand." People v Cantor, 36 NY2d 106, 113 (1975).
In this case, the police knew only that the woman they were following might be the defendant's girlfriend and that the man driving the car she entered could possibly be the defendant because he matched the defendant's race and approximate height. Although aware that the defendant had been positively identified as the person who had shot the victim, the police did not know the identify of the car's driver. The car had not been utilized in the crime and had not been connected to defendant in any way. On these facts, the inference that the defendant was the car's driver was far too tenuous to rise to the level of reasonable suspicion. Here, at the time of [*4]the stop, the police had no more than a "hunch," however accurate, that defendant was the driver of the car.
In order to lawfully stop the car under these circumstances, the police would have been required to verify the driver's identity first, information which could easily have been obtained by stopping next to the car at a red light, or waiting for some other opportunity to observe the driver. Therefore, the stop of the car was unlawful and all fruits of the resulting seizure must be suppressed, unless the People can establish an applicable exception to the exclusionary rule.
The People argue that the drugs and statements may be admitted, despite the unlawful stop, under the doctrine of inevitable discovery. The Inevitable discovery exception provides that "evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not admissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence." People v. Fitzpatrick, 32 NY2d 499, 506 (1973). To invoke this exception, the People must establish to "a very high degree of probability, that the evidence in question would have been obtained independently of the tainted source." People v Payton, 45 NY2d 300, 313 (1978) rev'd on other grounds, 445 US 573, on remand, 51 NY2d 169 (1980); see People v. Turriago, 90 NY2d 77, 86 (1997). The policy rationale behind the inevitable discovery exception is that precluding evidence which would have been discovered in any event through lawful means does not excuse the unlawful police conduct, but reduces the defendant's opportunity to receive an undeserved benefit, and prevents "the prosecution [from being] put in a worse position simply because of some earlier police error misconduct." Nix v Williams, 467 US 431, 443 (1984) (emphasis in original), see People v. Fitzpatrick, 32 NY2d at 507.
Further, under State constitutional law, the inevitable discovery exception does not permit the introduction of primary evidence which was "obtained during or as an immediate consequence of the challenged police conduct," but is limited to secondary evidence, which was "obtained indirectly as a result of leads or information gained from the primary evidence." People v Stith, 69 NY2d 313, 318-319 (1987); see People v. Turiago, 90 NY2d at 86. This limitation prevents the use of the tainted evidence itself, but saves the products of that evidence from exclusion. The rationale for distinguishing between the use of primary and secondary evidence is based squarely upon the policy reasons behind the exclusionary rule. The Stith court concluded that permitting the primary evidence into admission "effects what amounts to an after-the-fact purging of the initial wrongful conduct, and it can never be claimed that a lapse of time or the occurrence of intervening events has attenuated the connection between the evidence ultimately acquired and the initial misconduct. The illegal conduct and the seizure of the evidence are one and the same." 69 NY2d at 319. To permit the use of primary evidence would constitute "an unacceptable dilution of the exclusionary rule" and "defeat a primary purpose of that rule, deterrence of police misconduct." Id. Admission of the secondary evidence, by contrast, properly balances the costs and benefits of the exclusionary rule, precluding evidence directly tainted by the constitutional violation, while permitting the use of evidence only remotely related to the constitutional taint. Id. To avail themselves of the inevitable discovery doctrine, the People must, therefore, establish two things: that there was a source independent of the original unlawful conduct that would have inevitably led to the [*5]illegally obtained evidence, and that the evidence they seek to introduce is secondary evidence and not the very evidence obtained in the illegal police procedure.
In this case, the People argue that the evidence obtained following the unlawful stop of defendant's car would inevitably have been discovered because, if the police had not stopped the car when they did, they would have continued to follow it and to observe the driver and would inevitably have confirmed his identity, either while he was driving the car or after he reached his intended destination, a nearby shopping district. At that point, the police could lawfully have stopped the car, arrested defendant, and obtained the physical evidence and statements. This argument is wrong for two reasons.
First, it is unsupported by the hearing testimony. Detective Saint John candidly testified that he intended to stop the car as soon as he observed the woman he suspected might be defendant's girlfriend enter it and saw that the driver matched the defendant's general description. He explained that he followed the car for several blocks until it reached a location where traffic conditions rendered it possible to impede its further progress and a stop could safely be made. At no point did the detective express any desire to positively identify the driver before effecting the stop. Nor did he make any attempts to do so. This testimony fails to establish to a high degree of probability that the police were going to make any attempt to identify the defendant before stopping the car or otherwise seizing his person.
Second, and more importantly, the People's alternate scenario cannot be used to establish inevitability because it is merely an assertion that if the People had not unlawfully stopped the car, they would have done so lawfully. The inevitable discovery exception was not intended to serve as a means to validate the illegal stop, search or interrogation, itself. See People v. Roberts, 106 AD2d 850 (4th Dept. 1984). A flawed search or seizure cannot be "reincarnated as a hypothetical untainted one." People v. Knapp, 52 NY2d 689 (1981). Inevitable discovery requires concrete proof that the challenged evidence would have been found through alternate legal investigative means.
Courts have found the proof sufficient where the police had or would necessarily have obtained information justifying the discovery of the same evidence either because a search was being planned or already in progress which would have led to the evidence (see Nix v. Williams, 467 US 431 [1984]; People v. Dempsey, 177 AD2d 1018 [4th Dept. 1991]; People v. Strickland, 169 AD2d 9 [3d Dept. 1991]; People v. Herman, 144 AD2d 485 [2d Dept 1988]), the evidence would have been found through alternate ordinary investigative steps (see People v. Turriago, 90 NY2d at 86-87 [inventory search of van]; People v. Fitzpatrick, 32 NY2d at 507 [search of closet in which murder defendant was hiding]; People v. Payton, 45 NY2d at 313-314 [investigation of gun dealers to locate seller of weapon used in murder]; People v. Watson, 188 AD2d 501, 502 [2d Dept. 1992] [inspection of pawn shops for stolen jewelry]; People v. Silver, 178 AD2d 499, 500 [2d Dept. 1991] [inventory search of defendant at precinct]; People v. Ruffin, 133 AD2d 425 [2d Dept 1987] [investigation of reported burglary]), or because the police possessed a source independent of the tainted evidence to support the issuance of a search warrant (see People v. Burr, 70 NY2d 354 [1987]; People v. Binns, 299 AD2d 651 [3d Dept. 2002]). Thus, the People must prove that the challenged evidence would have been discovered through independent lawful police conduct, not merely, as asserted here, by correctly carrying out the challenged conduct itself.
[*6]
In this case, the People would have been required to prove that the police were likely to have encountered, identified, and arrested the defendant through some means other than by these officers following and stopping the car he was driving. This they did not do. Indeed, in cases such as this one, where the illegal police conduct is the very first conduct bringing them into contact with the defendant, it may be impossible for the People to meet their burden of establishing a very high degree of probability that the police would have lawfully encountered the defendant in some way other than the improper conduct actually employed.
The People also failed to establish that the physical evidence recovered at the scene of the stop and seizure of the defendant was secondary evidence. Relying on People v. Binns, 299 AD2d at 651, the People argue that where police mistake or misconduct leads to the identification of a person or the location of a place to be searched, the identification is the primary evidence and the evidence obtained from the resulting search is secondary evidence. This is an oversimplification. Each case must be decided on the specific facts presented. 
 In Binns, the primary evidence was a key seized unlawfully from the defendant and used, along with information from other sources, to locate the defendant's apartment and to obtain a search warrant for that apartment, which was found to contain drugs and money. The Appellate Court concluded that the key was primary evidence that had to be suppressed, but that the physical evidence found inside the apartment was properly admitted. Id. at 653-654.
Binns demonstrates the distinction between primary and secondary evidence. The key was the primary evidence improperly seized from the defendant. The evidence found inside his apartment was secondary evidence. It was obtained only after an investigation of the key, combined with other information, led to the apartment, and after the police had obtained a search warrant for which they had a basis, unrelated to the key itself, from a confidential informant's statement that defendant was storing drugs in the apartment. The mere observation or seizure of the key did not identify the apartment or permit its search. Thus, the evidence found in the search was not an "immediate consequence" of the illegal seizure of the key, but was evidence "obtained as a result of information gleaned from or by other exploitation of" the key. See Stith, 69 NY2d at 318-319. In the instant case, by contrast, the unlawful seizure of the defendant's person led directly to the detective's observation and recognition of him as the person wanted in the prior shooting incident. Because the police already had probable cause to arrest the defendant upon locating him, that observation alone gave the police authority to arrest the defendant and to search his clothing for weapons. Contrary to the People's position, the search of the defendant's jacket was the direct and immediate consequence of stopping the car. There was neither a temporal nor spatial separation between the observation of the defendant's face and the observation of him shrugging off his jacket before getting out of the car. Nor was the search of the jacket predicated upon anything more than a concern for the officers' safety based on the information, already possessed by Detective Saint John, that the defendant was wanted for a shooting and the fact there was another occupant in the car who had ready access to the jacket. Thus, the search of the jacket was not the product of any investigation of the defendant's identity. Nor was it the result of any information developed during the arrest of the defendant. Therefore, the search of the defendant's person and his jacket was an "immediate consequence" of the unlawful seizure, and the drugs and money recovered therein constitute primary evidence which must be suppressed.
[*7]
The defendant's statements, however, were secondary evidence because the first statement, made at the arrest scene, was made only after the defendant had been arrested and had observed the arrest of his girlfriend. The other statements were made at the precinct, during the arrest processing or upon questioning by the police. They were, therefore, not the direct consequence of the illegal car stop and seizure of the defendant. Nevertheless, in light of the court's finding that the People have failed to show that the doctrine of inevitable discovery is applicable to the facts of this case, this court must also suppress the statements made by the defendant subsequent to his stop and arrest as the fruits of an unlawful arrest.
 Conclusion
Therefore, and for the foregoing reasons, the defendant's motion to suppress the drugs, money, and statements are granted. The motion to suppress the identification is denied. This constitutes the decision and order of the court.
Hon. Albert Tomei, J.S.C.
Decision Date: February 06, 2004
Footnotes

Footnote 1:The defendant was subsequently indicted for criminal possession of a controlled substance in the second degree. He was never indicted for the shooting incident because the victim disappeared before the grand jury presentation could be made. Ms. Roper was not charged with any crime.