THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID BURR, Appellant.

Fourth Department, January 23, 1987

6

**APPEARANCES OF COUNSEL**

*Rose H. Sconiers (Linda Reynolds* of counsel), for appellant.

*Richard J. Arcara, District Attorney (J. Michael Marion* of counsel), for respondent.

**OPINION OF THE COURT**

BOOMER, J.

Defendant appeals from a judgment, entered upon a jury verdict, convicting him of murder in the second degree. He raises issues concerning his warrantless arrest in his home and the seizure of certain items pursuant to a search warrant. Defendant contends that the initial entry into his home was illegal and that the police exploited the illegality in obtaining his statement and in applying for the search warrant. Consequently, he argues, the suppression court committed reversible error in refusing to suppress the statement and the items seized pursuant to the search warrant. We disagree.

I

The testimony at the suppression hearing shows that the police first learned about the murder of John Borek from a

friend of defendant's, Timothy Murray, who came to the police station with his father and gave a detailed statement. Murray recounted that the night before he, along with defendant, defendant's girlfriend, Borek, and others were drinking wine and smoking marihuana in defendant's apartment. After the others left, defendant, in the presence of his girlfriend and Murray, assaulted Borek with a table leg, knocking him to the floor. Defendant got on top of Borek and stabbed him in the thigh with a buck knife. He then ordered Murray to tie Borek's hands and leg with extension cords and he, his girlfriend, Murray and Borek left the apartment. Outside, defendant's girlfriend left and defendant and Murray walked some distance with Borek to an isolated area. There, after causing Murray to undress Borek, defendant stabbed Borek in the eyes, arms, mouth, chest, and throat and began jumping upon his chest yelling, "Come on, die. Come on, die." When Borek stopped breathing, defendant ordered Murray to remove a sewer cover and to help him throw the body into the sewer. Defendant and Murray then walked to a reservoir where defendant threw Borek's clothes and the buck knife into the water. Murray also told the police that defendant said he was going to Houston, Texas.

The police went to the sewer described by Murray where, at 10:30 P.M., they found Borek's body. Murray's statement was transcribed and sworn to at 11:45 P.M., and between 12:30 and 12:45 A.M. the Chief of the Homicide Bureau directed the police to arrest defendant. The Chief decided to have defendant arrested at his apartment without a warrant because, in view of Murray's statement that defendant intended to leave town, the hour of the night, and the unavailability of a Judge, there was no time to obtain a warrant. Following the Chief's instructions, the police went to defendant's apartment and knocked on the door. Although they heard movement inside, there was no response, so the officers tried to kick in the door and then had firemen pry it open. Inside they found defendant hiding under a bed and when he emerged, he shouted, "I didn't kill him, Timmy Murray did."

After arresting defendant, one of the officers looked in defendant's clothes closet and noticed a knapsack. The officer also picked up a jacket which was hanging on the back of the bedroom door.

The next morning, the Chief directed a police officer to obtain a warrant to search defendant's apartment. The only information the officer had concerning the crime was Mur-

ray's sworn statement, and to establish probable cause, he attached a copy of that statement to the application for the warrant. Following the issuance of the warrant, police searched the apartment and seized a navy blue pea coat, two extension cords, and a coffee table and table leg. After defendant was arrested and before the search warrant was issued, the police took photographs showing the layout of the apartment. Only the extension cords, the table leg, and the photographs were introduced at trial.

At trial, defendant's girlfriend corroborated Murray's testimony that defendant, while on top of Borek, stabbed him in the thigh and that defendant, Murray, and Borek left the area of the apartment together. The police testified that they found Borek's clothes in the reservoir and on top of the clothes, the blade of a knife. Defendant was known to carry a knife in a case attached to his belt.

## II

■ Based upon the testimony at the hearing, the suppression court properly found that the arrest of defendant in his home without a warrant was justified because of exigent circumstances.

Although, absent a warrant, the police may not make a routine arrest within a person's home, a warrant is unnecessary under "exigent circumstances" *(Steagald v United States,* 451 US 204, 221; *Payton v New York,* 445 US 573, 590). The Supreme Court has not adopted any criteria for determining the existence of exigent circumstances, but other courts have given us some guidelines. Although not to be taken as a rigid formula, the following factors should be considered in determining whether exigent circumstances exist: (1) the gravity or violent nature of the offense; (2) whether there is reason to believe the suspect is armed; (3) whether there is a clear showing of probable cause; (4) whether there is strong reason to believe the subject is in the premises being entered; (5) the likelihood the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry *(United States v Campbell,* 581 F2d 22, 26; *Dorman v United States,* 435 F2d 385, 392-393; *People v Gordon,* 110 AD2d 778, 780; *see also, People v Martin,* 50 NY2d 1029, 1031, n 2).

Here, (1) the crime, a savage murder, was grave and violent; (2) the subject was armed with a knife when he committed the murder and there was no reason to believe he would not have

access to a knife in his apartment; (3) the showing of probable cause that defendant had committed a murder was clear; (4) there was strong reason to believe defendant was in his apartment because Murray had said that he and defendant returned to the apartment after the murder, and when the police knocked on the door they heard someone inside; (5) there was a likelihood defendant could escape if not swiftly apprehended because Murray had told the police that defendant said he was going to leave for Houston, Texas; and (6) although the police used force to gain entry, the use of force does not preclude a warrantless entry (*Dorman v United States, supra,* p 393). Here the entry did not provoke a confrontation. The police first knocked on the door and announced their presence, and only when there was no response did they kick at the door and have the firemen pry it open. Another circumstance adding to the exigency was that after the police had found the body and had thus obtained clear probable cause, it was close to midnight and it was unlikely that, at that time, they could obtain a warrant expeditiously.

It may be argued that to prevent defendant's escape, the police should have guarded the premises and waited until morning to obtain a warrant. This argument was found unreasonable in *United States v Campbell* (581 F2d 22, 26-27, *supra),* where the court stated: "Moreover, had the officers decided to set up surveillance of the apartments while waiting for a warrant to be issued, they would have risked the possibility of detection by appellants. If appellants had been alerted to the presence of the police, they might well have had sufficient time to dispose of the stolen money and other evidence in their possession. Furthermore, the risk of an armed confrontation would have thus been heightened. To secure a warrant would have required the police and agents to wait at least several more hours until the facts were fully communicated to headquarters, typed in affidavit form, attested to, presented to one of the district's busy magistrates, and a warrant obtained in due course."

In *Campbell (supra),* the court stressed the reasonableness of the police action in waiting to make the arrest until they had fully investigated the crime and obtained clear probable cause. Here, the police acted reasonably in investigating Murray's accusations by going to the scene of the murder where they found the body and by taking a detailed sworn statement from Murray. Only then did they have clear probable cause to make the arrest.

Since there were sufficient exigent circumstances to justify the warrantless entry and arrest, there was no basis for the suppression of defendant's statement that Murray, not he, had committed the crime.

## III

■ Nor was there any basis for suppressing the items seized pursuant to the search warrant. Even if the initial entry were held to be illegal, there was no showing that the search and seizure following the issuance of the warrant was tainted by the illegality. As Judge Jasen wrote in *People v Arnau* (58 NY2d 27, 32, *cert denied* 468 US 1217), because the exclusionary rule exacts a heavy price, "courts have long held that only evidence which ' "has been come at by exploitation of that illegality" ' should be suppressed. *(Wong Sun v United States,* 371 US 471, 488, quoting Maguire, Evidence of Guilt [1959], p 221; 3 LaFave, Search & Seizure, § 11.4, p 613.)" Here, in obtaining the search warrant, the police did not exploit the initial entry. The officer applying for the warrant had received no information about the crime other than the facts contained in Murray's sworn statement and the application was based solely upon that statement. Further, there was no indication that the items introduced into evidence at trial and seized after the issuance of the search warrant were either discovered or seized during the initial entry.

The only items of evidence the police obtained from the apartment before they obtained the search warrant were the photographs of the interior of the apartment. These photographs depict no incriminating evidence and were used at the trial only to show the layout of the apartment. Defendant has not suggested that he was in any way prejudiced by their use at trial.

## IV

■ Further, even if defendant's warrantless arrest were illegal and his statement therefore should have been suppressed, that error would be harmless. The proof that defendant and Murray were together before and during the time that the victim was killed was overwhelming. Under the circumstances, defendant's only line of defense was to point to Murray as the killer. So viewed, his statement to the police that Murray did it was exculpatory rather than inculpatory. Thus, there was no reasonable possibility that the error might

have contributed to defendant's conviction *(People v Crimmins,* 36 NY2d 230, 237).

We have examined the other arguments made in defendant's brief and in his supplemental *pro se* brief, and we conclude that they do not warrant reversal. Accordingly, the conviction should be affirmed.

GREEN, J. (dissenting). We must dissent. In our view, the warrantless entry of the police into defendant's apartment was in violation of *Payton v New York* (445 US 573). Although the police may have had probable cause to arrest defendant the question is whether, assuming the existence of probable cause, it was lawful to arrest defendant in his home without first obtaining a warrant *(see, People v Clements,* 37 NY2d 675, 678-679, *cert denied sub nom. Metzger v New York,* 425 US 911). The majority justifies the warrantless arrest on the theory that defendant was about to flee. We disagree.

The burden of showing the existence of an exigent circumstance rests squarely upon the People *(People v Knapp,* 52 NY2d 689, 694), a burden they have not met on this record. The crime occurred during the evening of June 8, 1983. At approximately 9:45 P.M. the next day Timothy Murray, a participant in the crime, informed police of the murder and stated that defendant was going to flee to Houston, Texas. At approximately 12:45 A.M. the Buffalo Police Chief of Homicide directed his subordinates to go to defendant's apartment and arrest the defendant. The police made no effort to seek a warrant because they believed the hour was too late to find a Judge to issue one.

If defendant had really intended to flee, he likely would have done so within the 24 hours following the crime. This was not a case in which the police were in hot pursuit of a suspect immediately following a crime *(cf. Warden v Hayden,* 387 US 294, 298-300). Moreover, the information of defendant's intention to flee came from a participant in the crime who, although accurate as to other details, could have fabricated certain information to deflect police attention away from him and toward defendant.

Even assuming the information of defendant's intended flight was reliable, however, there was ample time for the police to obtain a warrant. We "must be careful to distinguish between constraints on police conduct which limit effective police enforcement and those constraints which merely make effective police enforcement more burdensome" *(People v Spin-*

*elli,* 35 NY2d 77, 81). Judges are available to entertain warrant applications any day of the week, any time of the day or night. Here, the police made no attempt whatsoever to contact a Judge, but merely presumed that such an effort would be unsuccessful. This deficiency is particularly alarming given the recent statutory alternative whereby the police may obtain a warrant by oral application *(see,* CPL 690.36). This legislation was intended to reduce the need to rely on exigent circumstances and to minimize the occasions where members of the public will be subject to warrantless intrusions on their privacy by government officials *(see,* Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 690.36, p 387).

Four police officers were sent to defendant's apartment building to arrest him. One officer watched the front of the building, one officer watched the back of the building and the other two officers knocked on the door to defendant's apartment. They heard movement inside and tried to kick down the door, without success. The police then called the fire department and the door was pried open with an axe approximately 15 minutes later *(cf. People v Green,* 103 AD2d 362, 364). Thus, there is no reason why the police, having surrounded the apartment building and secured the exits to defendant's apartment, could not have continued to guard the building while obtaining a warrant. If the police had time to call the fire department to axe open defendant's door, they had time to call a magistrate to obtain a warrant. The majority's reliance upon *United States v Campbell* (581 F2d 22, 26-27) is misplaced since the rationale there was that defendants, charged with possessory crimes, could have disposed of the contraband in the interim. That theory has no relevance to the facts of the instant case.

The majority's reliance on *People v Gordon* (110 AD2d 778) also is misplaced. There the court found exigent circumstances to enter an apartment without a warrant. In *Gordon,* the police had to act quickly because the mother of defendant's girlfriend told police defendant was leaving as soon as she returned to her apartment. There was also the issue of consent given to the officers by the mother who owned the apartment, where the daughter's boyfriend had no expectation of privacy. Here, we have defendant in his own apartment almost 24 hours after the crime.

There is no question here that the crime the police were investigating was a serious one. But the seriousness of the

offense, by itself, does not create an exigent circumstance to justify a warrantless intrusion on a defendant's constitutional right to privacy *(see, Mincey v Arizona,* 437 US 385, 394). It is important to note that the facts of this case are strikingly similar to the facts in *Payton.* Here, as there, defendant was a suspect in a murder and identified by an eyewitness to the crime. Here, as there, several officers went to defendant's apartment and summoned help to force open the door. In both cases, the police were aware of defendant's identity and place of residence hours before the warrantless break-in. In the intervening period they had ample opportunity to secure the approval of a detached judicial officer. Moreover, even at the time of the forcible entry the police were compelled to delay further while awaiting the arrival of other agencies during which time the officers again could have secured the necessary warrant.

The 4th Amendment requires that the evaluation of probable cause to arrest a suspect in his home be made, in the first instance, by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime" *(Johnson v United States,* 333 US 10, 14). Since this was not done in the instant case, all evidence gained by exploitation of the illegal entry must be suppressed as fruit of the poisonous tree *(Wong Sun v United States,* 371 US 471, 488). Accordingly, the judgment should be reversed, defendant's motion to suppress should have been granted, and a new trial granted.

DOERR, J. P., and BALIO, J., concur with BOOMER, J.; GREEN and PINE, JJ., dissent and vote to reverse the judgment, grant defendant's motion to suppress and grant a new trial in an opinion by GREEN, J.

Judgment affirmed.