*357 OPINION OF THE COURT
Kaye, J.
 In seeking to overturn his murder conviction, defendant challenges the legality of the warrantless arrest in his home, as well as the admission of physical evidence seen before — but taken from his home after — a search warrant was obtained. While we recognize that a confirmatory search[1] may require the suppression of evidence, the record in this case supports denial of all of defendant’s challenges and affirmance of his conviction.
On Sunday, January 9, 1983, at approximately 9:45 p.m., Timothy Murray and his father appeared at the Buffalo Police Department with information about a murder Murray claimed to have witnessed. He told police that the previous evening he had been at defendant’s apartment with defendant (whom he had known for 10 years), defendant’s girlfriend and John Borek, and that in the early morning, he had seen defendant kill Borek, put Borek’s body into a manhole, and throw his clothing and a knife into a reservoir. Murray then led police to the manhole and the reservoir. A naked body was visible in the sewer, and clothing and a pair of boots were found in the reservoir. Murray and the police returned to the station where, at 11:45 p.m., Murray gave a statement.
In a full, detailed statement, which was transcribed and sworn, Murray related the following events. During an argument with Borek in defendant’s apartment, defendant hit his victim on the head with the leg of an endiable; poked him in the throat, face and chest with a four-inch brown-handled lock-blade "buck knife” that he carried in his belt; and banged his head against the kitchen radiator. Defendant then plunged the knife into Borek’s left leg saying that he wanted to watch him bleed to death. Defendant ordered Murray to tie Borek’s hands, which he did with an extension cord he found in the apartment. Defendant then led Borek out of the apartment to the railroad tracks, ordered Murray to strip him, and began stabbing him in the mouth, face, throat and body, screaming that he liked the sight of blood. Defendant jumped up and down on Borek’s chest and kicked him in the head, shouting "camón die, camón die.” Murray helped defendant put Borek *358 into a manhole and heard defendant say, "don’t forget I killed you and I made one of your friends watch.” Defendant threw Borek’s clothes and the knife into a nearby reservoir and took Murray back to defendant’s apartment, where he warned Murray to keep his mouth shut or he would kill him. Defendant placed the clothes he was wearing into a garbage bag in his bedroom closet, dressed, and told Murray that "he was going to Houston, Texas and he would keep in touch with [him].” That evening Murray reported the incident to the police.
Between midnight Sunday and one o’clock Monday morning, Leo Donovan, homicide chief — who had been at the scene when the body was discovered — directed Police Detective Edwin Gorski to arrest defendant at his apartment. While two officers watched the building entrance, Gorski and another detective knocked on defendant’s door and identified themselves. Although the police could hear movement inside, no one responded. With the aid of the fire department, the police opened the apartment door as well as the door to defendant’s bedroom.
While in the apartment looking for defendant, Gorski noticed a jacket which appeared to be bloodstained.[2] Defendant meanwhile was found hiding under the bed and, as the officers pulled him to his feet, he shouted, "I didn’t kill him, Timothy Murray did.” The officers then handcuffed defendant to a chair in the kitchen. During questioning in the kitchen, Gorski observed electrical cords. (Indeed, Gorski testified that all of the items later taken pursuant to warrant had been seen by him in the apartment during the period defendant was handcuffed in the chair.)
Shortly after the arrest, Chief Donovan arrived at the apartment. He summoned an evidence squad, directing them to pick up items that might be evidence and photograph the entire apartment. As Chief Donovan testified in the suppression hearing, "I don’t see anything wrong with looking around in a place where we believe a crime was committed.” After defendant had been taken to the police station, the police remained in the apartment until about 3:00 a.m., securing the door when they left.
Later that morning Chief Donovan directed Detective Delano to read Murray’s statement and obtain a search warrant. *359 Detective Delano testified that based only on that statement he prepared an affidavit, appending the Murray statement to it. After obtaining a warrant, Detective Delano and two detectives who had been present the night before, returned to defendant’s apartment where they recovered a jacket and electrical cords. Chief Donovan directed another officer to make sure that a table and its broken legs were seized when the warrant was executed. That officer went to the apartment as the others were leaving. Detective Delano made a handwritten addition to the typed return indicating that the table and legs also had been recovered. All of the items seized pursuant to warrant were mentioned in Murray’s statement.
After a pretrial suppression hearing, the warrantless arrest of defendant in his home was sustained. The suppression court found probable cause to believe that defendant had murdered Borek in that the information given to police by Murray was recent, based on personal observation, extremely detailed and verified by police observation. The court then found that "[confronted late at night, with information that the alleged perpetrator of the homicide was preparing to flee the jurisdiction for Houston, Texas; information * * * they were * * * entitled to rely on under the circumstances,” the "police found themselves in obvious exigent circumstances and were entitled to proceed to arrest the defendant in his home, as quickly as possible, without a warrant.” Defendant’s statements were held admissible as spontaneous utterances following a lawful arrest.
Defendant also moved to suppress various items of physical evidence, including the jacket, table and cords. He contended that even if the police had lawfully arrested him, they acted unlawfully in conducting a pre-warrant search of the apartment after he had been handcuffed. Defendant premised his argument for suppression on People v Arnau (58 NY2d 27), arguing that the case was distinguishable in result because the police there had only secured — and did not search — the suspect’s home while they obtained a warrant. Thus, there was no exploitation or taint of the subsequent search pursuant to warrant. Here, defendant urged, the search conducted by Chief Donovan and his evidence squad was unlawful and therefore did taint the subsequent lawful search. The suppression court concluded that once defendant had been arrested, the police were not justified in remaining on the premises and conducting a warrantless investigative search, and therefore suppressed all items taken from the apartment before the *360 warrant issued. Those items are no longer in issue. Nonetheless, the court found that the evidence seized during the search pursuant to warrant was admissible because the warrant was supported by an independent source of probable cause, untainted by anything the police may have illegally learned earlier from defendant or obtained from his home.
A divided Appellate Division affirmed, the majority agreeing that there were exigent circumstances to justify the warrantless arrest (124 AD2d 5). The court further ruled that, even if the initial entry was illegal, there had been no showing that the search and seizure following the issuance of the search warrant was tainted by any illegality. To the contrary, the court noted that the warrant application was based solely on Murray’s statement and did not exploit the initial entry. Thus, the jacket, table and cords were properly admitted.[3] We now affirm.
The Warrantless Arrest
The warrantless arrest of defendant in his home would violate both the State and Federal Constitutions (NY Const, art I, § 12; US Const 4th Amend) unless based on probable cause and justified by exigent circumstances (People v Mealer, 57 NY2d 214, 218; Payton v New York, 445 US 573, 590, on remand 51 NY2d 169). Both lower courts found that the arrest was justified because, after the police investigation and Murray’s statement, the police had clear probable cause to believe that defendant had murdered Borek, and because there were exigent circumstances in (among other things) the combined savagery of the crime, the late weekend hour, and defendant’s expressed intention to flee the jurisdiction.[4] These determina *361 tions involve mixed questions of fact and law and where, as here, there is support in the record for such undisturbed findings, they are beyond the scope of our review (People v Hicks, 68 NY2d 234, 238; People v Dory, 59 NY2d 121, 127). Concluding that the arrest was lawful, we reject defendant’s contention that his statements and the physical evidence must be suppressed as "poisoned fruit.” Further, we agree that defendant’s statements at the time of arrest are admissible as spontaneous utterances (see, People v Bryant, 59 NY2d 786, 788).
The Warrantless Search
Even assuming a lawful arrest, however, defendant urges suppression of the jacket, table and cords seized pursuant to warrant because this evidence was secured as the result of unconstitutional police conduct before obtaining and executing the warrant. When the police act illegally during the process of obtaining evidence, that evidence may nonetheless be admissible if gained from an independent source without taint or exploitation of the illegality by the police (see, People v Arnau, 58 NY2d 27, 32-33, supra; see also, Silverthorne Lbr. Co. v United States, 251 US 385, 392). Defendant claims that this "independent source” rule should not be applied to cleanse the prior police misconduct here.
A bedrock principle of our law is that police officers who believe they have probable cause must obtain a warrant before conducting a search (see, NY Const, art I, § 12; US Const 4th Amend; see also, CPL art 690). If a Magistrate concurs with the officers’ belief, a warrant will issue; if not, the officers cannot search unless they obtain additional evidence that persuades a Magistrate to issue a warrant (see, People v Hanlon, 36 NY2d 549, 559; Johnson v United States, 333 US 10, 14). The constitutional warrant requirement "is designed to interpose the detached and independent judgment of a neutral Magistrate between the interested viewpoint of those engaged in ferreting out crime and potential encroachments on the sanctity and privacy of the individual”. (People v Hanlon, supra, at 558.) Our distaste for warrantless searches "bespeaks an aversion to the existence of unchecked and unlimited power in the hands of those employed to enforce laws” and a recognition that "where a search warrant has been obtained the dangers of unbridled power are minimized.” (Id., at 559, 560.)
*362 To permit the police to search first and obtain a warrant only if their search uncovers or "confirms” that there is incriminating evidence would ordinarily violate the warrant requirement (see, People v Arnau, 58 NY2d 27, 31, supra; United States v Griffin, 502 F2d 959, 961, cert denied 419 US 1050). Were such a practice countenanced, the police might easily avoid having to demonstrate lawful "probable cause” as the law demands. They could "instead achieve 'certain cause’ by conducting an unlawful confirmatory search, thus saving [themselves] the time and trouble of obtaining and executing a warrant if [they do] not find the evidence.” (People v Cook, 22 Cal 3d 67, 98, 583 P2d 130, 148.) So insulated, the police could safely engage in such conduct because, if evidence were found in the course of an illegal search, they would still be permitted to seize it in a second search under independent color of law and use it at trial. Obviously, such a practice undermines the very purpose of the warrant requirement and cannot be tolerated. "[E]very time [a police officer] fails to find the suspected evidence, he has also invaded the privacy of a citizen innocent of any wrongdoing.” (Id.; see also, 4 LaFave, Search and Seizure § 11.4 [f], at 424-426 [2d ed].)
The presence of an independent source for a warrant and subsequent search therefore does not automatically immunize an initial warrantless search and insure the admissibility of evidence eventually seized pursuant to the warrant.
Just as the independent source rule does not automatically immunize prior police misconduct, so the fact that there has been a warrantless initial search does not invariably require the suppression of evidence later seized pursuant to warrant. Application of the exclusionary rule — the price paid by society in particular cases for the greater value of deterring future police wrongdoing — is exacted when, in the particular criminal trial, the prosecution has somehow exploited or benefited from its illegal conduct, when there is a connection between the violation of a constitutional right and the derivative evidence (see, Wong Sun v United States, 371 US 471, 478; 4 LaFave, Search and Seizure § 11.4 [a], at 374 [2d ed]). In the case of a confirmatory search, such exploitation or benefit may be found in the fact that the police have used the search to assure themselves that there is cause to obtain a warrant. Given such a nexus, the derivative evidence seized under color of the subsequent search warrant may be suppressed.
In this case, however, defendant made no claim that the *363 initial search was improperly undertaken by the police to verify or confirm the information in Murray’s statement, which was then used to obtain a warrant. Defendant’s failure to raise the claim not only deprived the People of any opportunity to rebut such a contention but also left an inconclusive record on the issue. For example, while it is undisputed that the police rummaged through defendant’s home without a warrant, there is support in the record for the conclusion that all of the evidence seized pursuant to the warrant had been observed in plain view in the course of the lawful arrest, thus negating any need for a confirmatory search. Nor does the record establish that there was any other connection between the police misconduct and the evidence ultimately recovered from defendant’s apartment.
Defendant’s remaining contention lacks merit.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order affirmed.

. A confirmatory search is one conducted by law enforcement officers without warrant or exigency, for the purpose of assuring or "confirming” that it is worth their time and effort to obtain a search warrant. (See, 4 LaFave, Search and Seizure § 11.4 [f], at 425 [2d ed].)

. The ensuing recitation is taken from police testimony given without contradiction at the suppression hearing.

. [3] The photographs of defendant’s apartment taken during the illegal search were improperly admitted by the suppression court under the theory of "inevitable discovery.” The doctrine of inevitable discovery may not be used to excuse unlawful police actions by admitting what was obtained as a direct result of the misconduct (People v Stith, 69 NY2d 313, 319). Nevertheless, we agree with the court below that any error in their admission was harmless (124 AD2d 5, 10). The photographs were used at trial to show the layout of the apartment; defendant indicates no prejudice by their admission at trial.

. An additional circumstance supporting the lower courts’ findings is the testimony of Chief Donovan, an experienced police officer, that he had not sought a warrant, in part because of "the unavailability of a judge” at that late hour. Significantly, the record does not contain any information suggesting that a Magistrate was available on weekend nights to entertain warrant applications.