Elaine MATTHEWS, Plaintiff,

v.

Regina A. MALKUS and Westchester County Medical Center, Defendants.

No. 04CIV.5561CMLMS.

United States District Court, S.D. New York.

July 12, 2005.

Elaine Matthews, Tarpon Springs, FL, pro se.

Robert J. Gironda, Wilson, Bave, Conboy, Cozza & Couzens, White Plains, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

MCMAHON, District Judge.

Plaintiff Elaine Matthews, a resident of Florida, commenced this action against Regina Malkus, a nurse, and her employer, the Westchester Medical Center. In April 2003, Matthews called Malkus, who was working at a crisis hotline operating out of Westchester County, New York. Matthews said something about killing herself or wanting to die, and Malkus believed Plaintiff was expressing "suicidal ideations." So she phoned authorities in Florida (where Matthews lived) to alert them to a potentially suicidal person. The local police in Florida arrived and took Plaintiff to a hospital, where she stayed for twenty-nine hours for evaluation. No one fed or watered plaintiff's cat while she was in the hospital, and shortly after she arrived home, the cat died.

Plaintiff has filed this action, claiming: (i) medical malpractice and/or professional negligence and/or professional recklessness; (ii) negligent misrepresentation; (iii) defamation/slander; (iv) false imprisonment; (v) false light; (vi) invasion of privacy/trespass; and (vii) violations to civil rights and to constitutional guarantees, (viii) intentional and/or negligent infliction of emotional distress. Defendants move for summary judgment on all claims.

For the reasons stated below, Defendants' motion for summary judgment is GRANTED and all claims are dismissed.

## I. Facts

The following undisputed facts are assumed true for purposes of this motion:

Just after midnight on Thursday, April 3, 2003, plaintiff Elaine Matthews ("Matthews") dialed 411 and asked the information operator for the number of a 24–hour help line in the 914 area code. Complaint ("Cplt.") at ¶ 9. Matthews lives in Florida but was originally from Westchester County, where 914 is the area code. *Id.* at ¶ 10. Matthews was given the number for the Westchester County Department of Social Services, which, after hours, has its calls transferred to the Westchester County Police. *Id.* at ¶ 11.

When Matthews' call was answered by the police department, Matthews explained that she was trying to reach a 24–hour help line. *Id.* at ¶¶ 12, 13. Matthews was subsequently transferred to the Westchester County Medical Center Crisis Line, where defendant, Regina Malkus ("Malkus"), answered the phone. Cplt. at ¶ 14; Malkus Aff. at ¶ 4. Matthews asked Malkus for her number so that she could call her right back. Cplt. at ¶ 14; Malkus Aff. at ¶ 7.

Malkus gave Matthews her number at the Westchester County Medical Center, and Matthews called her there. *Id.* at ¶ 15; Malkus Aff. at ¶¶ 7, 8. During the course of the conversation, Matthews said either "I wish I were dead" or "I want to die." *Id.* at ¶ 20; Malkus Aff. at ¶ 13. Malkus had a "caller identification" feature on her telephone at the medical center so

she knew Matthew's phone number and where she was calling from. *Id.* at ¶¶ 23, 24; Malkus Aff. at ¶¶ 17, 20. Malkus suggested that Matthews call her local hospital. *Id.* at ¶ 26; Malkus Aff. ¶¶ 18, 19. The call ended. *Id.* at ¶ 27.

Malkus then called law enforcement officials in Pinellas County, Florida. She told them about Matthews's call and said that Matthews was having "suicidal ideations." *Id.* at 47; Malkus Aff. at ¶ 23. The police department gave Malkus the number for a "PENHS hotline." Malkus Aff. ¶ 23. Malkus called the hotline number and spoke to someone named "Oscar," who said he would call Matthews. Malkus Aff. at ¶¶ 24, 25.

Oscar contacted the Pinellas County Sheriff Department to ask that they make a welfare check of Matthews at her home. Malkus Aff. at ¶ 26. Prior to dispatching police officers to Matthews home, a representative of the Pinellas Sheriff Department called Malkus at the Westchester Medical Center. (Audio Tape: Conversations between PENHS and the St. Petersburg Police Department; the St. Petersburg Police Department and the Pinalles County Sheriff Department; the St. Petersburg Police Department and PENHS; the Pinalles County Sheriff Department and Malkus (Submitted on February 22, 2005) ("Matthews Tapes"))[1]. During the course of the conversation, the representative confirmed the information Malkus had provided PENHS with Malkus. *Id.* Malkus offered to call Matthews to ascertain her mental state. *Id.* The representative told Malkus that would be unnecessary, because police officers were being sent to perform a welfare check on Matthews. *Id.*

At around 9:00 a.m. on the morning of April 3, two law enforcement officers came to Matthews' condominium and rang her doorbell. Cplt. at ¶¶ 30–31. When Matthews opened the door, the police took her to a nearby hospital. *Id.* at ¶¶ 31–32. Some neighbors observed Matthews being placed in the police car. *Id.* at ¶ 33. Matthews was kept at the hospital until she could be evaluated by the attending psychiatrist. *Id.* at ¶ 35. At around 12:30 p.m. on Friday, April 4, Matthews was examined by the hospital's psychiatrist. *Id.* at ¶ 40. Approximately two hours later (or approximately 29 hours after she was involuntarily taken from her home), she was released from the hospital. *Id.* at ¶ 41. When Matthews returned home, her cat's food and water bowls were empty. The cat died the next day. *Id.* at ¶¶ 41, 44.

Matthews claims that, as a result of these events, she "severely suffered damage to her person, personal humiliation and fear, past and future mental pain, anguish and suffering, past and future emotional distress, past and future inconvenience, the past and future loss of capacity to enjoy life, and other damages." Cplt. at ¶ 79.

The negligence that plaintiff alleges by Malkus and the Westchester County Medical Center included: (1) not immediately informing plaintiff that the number she had been connected to was a mobile crisis line (Cplt. at ¶ 16); (2) not immediately informing plaintiff that her phone number showed up on defendants' caller identification (*Id.*); (3) failing to recognize that plaintiff's statement, "I wish I were dead," was a mere figure of speech (*Id.* at ¶ 20); (4) Malkus's responding in a "intimidating and menacing" way by saying, "I know your phone number" (*Id.* at ¶ 21); (5) Malkus telling law enforcement officials in Pinellas County, Florida that Matthews was having "suicidal ideations" (*Id.* at ¶ 46.). Plaintiff also alleges that "Malkus, when

---

**1.** The Matthews Tapes are in Chambers, where they have been duly reviewed. The Court will file them with the other exhibits on this motion.

working for Westchester Medical Center, showed a willful and wonton indifference to the rights of plaintiff, or such reckless indifference to plaintiff's rights as to be the equivalent of an intentional violation of those rights." (*Id.* at ¶ 53.)

## II. Procedural History

This is the second law suit filed by Matthews in this matter. Matthews elected to withdraw her initial suit, *Matthews v. Westchester Medical Center,* 03 Civ. 4011, after a telephonic initial pre-trial conference. At that conference (which was duly transcribed), this court questioned Matthews at length, to try to understand whether there was any basis for her lawsuit. Matthews apparently believed that the court was trying to assist defendants by doing so.[2]

When Matthews sought leave to withdraw her first action, the court suspected that she might be engaged in judge shopping. I explained to her that under the rules of our court, any subsequent action she filed in the Southern District of New York would end up assigned to me. However, I allowed her to withdraw her suit.

Matthews then filed a second suit in federal court in Florida. On defendants' motion, it was transferred from the United States District Court in the Middle District of Florida to the Southern District of New York in July 2004. As this court had warned Matthews, the new action was assigned to me.

Matthews made a motion for an order declaring that Florida law would govern her claims. The motion was denied. *Matthews v. Malkus,* 352 F.Supp.2d 398 (S.D.N.Y., 2004).

## III. Defendant's Motion For Summary Judgment Is Granted

### A. Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact," and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("*Anderson II* "). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment."

**2.** This court asks a lot of questions of the parties at initial pre-trial conferences, but

Matthews was having none of that.

*Anderson II,* 477 U.S. at 248, 106 S.Ct. 2505.

### B. Analysis

There are no genuine issues of material fact in this case, because all the material facts are undisputed. The only dispute is whether Malkus did anything that subjects either her or her employer to liability, on any theory. The answer is no.

All of the allegations in the complaint stem from Malkus's decision to call Florida authorities after plaintiff said something about wanting to die or kill herself. Nothing that Malkus did was wrongful, and Matthews provides no evidence to support her conclusory allegations that Malkus acted negligently or improperly, that she made any false statements, that she invaded plaintiff's privacy, or caused her to be falsely imprisoned, that she did anything to violate her civil or constitutional rights, or that she intentionally or negligently caused her any emotional distress.

### 1. Medical Malpractice and/or Professional Negligence and/or Professional Recklessness

Matthews' first cause of action is for "medical malpractice and/or professional negligence and/or professional recklessness." The basis of this state-law claim is that, "Malkus working for Westchester Medical Center failed in her position of registered nurse to act professionally, conscientiously, honestly, responsibly, ethically." Cplt. at ¶ 60. Essentially, Matthews's complaint is that Malkus, "did not realize that plaintiff had uttered the five words of 'I wish I were dead' as a figure of speech," but rather believed it was a manifestation of Matthews's "suicidal ideations." *Id.* at ¶ 67. This claim is meritless.[3]

In order to make out a claim for medical malpractice, plaintiff must allege facts that show a departure from good and accepted medical practice, as well as offer evidence that such departure was a proximate cause of the plaintiff's injury. *See Williams v. Sahay,* 12 A.D.3d 366, 367, 783 N.Y.S.2d 664, 666 (2d Dep't.2004) (citing *DiMitri v. Monsouri,* 302 A.D.2d 420, 421, 754 N.Y.S.2d 674 (2d Dep't., 2003)). "A claim of professional negligence requires proof that there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury." *Georgetti v. United Hosp. Med. Ctr.,* 204 A.D.2d 271, 272, 611 N.Y.S.2d 583 (2d Dep't., 1994). The negligence must be shown to be the cause of the event that produced the harm. *See Herbert H. Post & Co. v. Sidney Bitterman, Inc.,* 219 A.D.2d 214, 223, 639 N.Y.S.2d 329 (1st Dep't., 1996).

Matthews alleges only that Malkus misinterpreted her words, failing to recognize that Malkus did not mean to be taken literally when she said she wished she were dead. Cplt. at ¶ 65. She offers no evidence that Malkus's decision to contact Florida authorities deviates in any way from accepted standards of practice for a hotline operator. And I very much doubt that plaintiff could procure such evidence. One would hope that, if someone calls a *crisis* hotline and the person who answers the phone hears the caller express a wish to die, accepted standards of care would require the person to do err on the side of doing something rather than nothing.

### 2. Negligent Misrepresentation

Matthews second claim is for negligent misrepresentation, for "falsely report[ing] to Florida that plaintiff was an 'ex-patient' who had relocated to Florida

---

**3.** Matthews also states a claim for "professional recklessness" but, as far as this Court can tell, this is not a recognized cause of action under either New York or federal law.

and who was having 'suicidal ideations.'" Cplt. at ¶ 83.

It is axiomatic that a requisite element of negligent misrepresentation is the communication of some material misrepresentation. There was none here.

First, Matthews admits however, that she told Malkus that she wanted to die. Cplt. at ¶ 20. So it was no misrepresentation for Malkus to convey that to the Florida authorities.

Second, plaintiff herself admits that, prior to moving to Florida, she lived in Westchester County. So that was no misrepresentation either.

■ It appears that Malkus's description of plaintiff as an "ex-patient" of the Medical Center is not correct. However, that was not *material* misrepresentation. Assuming this to be untrue, "plaintiff must show ... that the misrepresentations directly caused the loss about which plaintiff complains." *Laub v. Faessel*, 297 A.D.2d 28, 31, 745 N.Y.S.2d 534 (1st Dep't., 2002). Matthews fails to adduce any evidence linking Malkus's characterization of Matthews as an "ex-patient" to her alleged injuries. The statement that sent the police to her door was Matthews's announcement that she wished she were dead, which Malkus interpreted as suicidal ideation—not anything about her patient status.

## 3. Defamation/Slander

Matthews third count is for defamation/slander, specifically for "falsely representing in telephonic communication with Florida that plaintiff was an 'ex-patient' who had 'relocated' to Florida and who was having 'suicidal ideations.'" Cplt. at ¶ 93.

■ There are four elements to a cause of action for defamation. (See Restatement 2d of Torts ¶ 558.):(1) a false statement, (2) publication without privilege or authorization to a third party, (3) by at least a negligence standard of fault and (4) the statement either causes special damages or constitutes defamation per se. *Public Relations Society of America, Inc. v. Road Runner High Speed Online*, 2005 WL 1364381, *2 (N.Y.Sup.2005) (citing *Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1st Dep't., 1999)).

■ As discussed above, Matthews admits she told Malkus that she wished she were dead and had formerly lived in New York before moving to Florida, Malkus's subsequent conveyance of this information—that Matthews admits is true— cannot form the basis of a defamation claim. Truth is a complete defense to a claim of defamation. *Diaz v. Espada*, 8 A.D.3d 49, 50, 778 N.Y.S.2d 38 (1st Dep't., 2004) (citing *Dillon*, 261 A.D.2d at 39, 704 N.Y.S.2d 1).

■ The statement that Matthews was an ex-patient may have been inaccurate, but plaintiff offers no evidence tending to show that the representation about former patient status cause her any special damage. It certainly does not constitute defamation *per se*, which requires statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease, or (iv) imputing unchastity to a woman. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992).

■ Slander is the uttering of defamatory words which tend to injure another in his reputation, office, trade, etc. *See Liffman v. Booke*, 59 A.D.2d 687, 688, 398 N.Y.S.2d 674 (1st Dep't., 1977) (citing CPLR 3016(a)). In order to constitute slander, "the words must be defamatory in their nature; and must in fact disparage the character; and this disparagement must be evidenced by some positive loss

arising therefrom directly and legitimately as a fair and natural result. In this view of the law, words which do not degrade the character do not injure it, and cannot occasion loss." *Connelly v. McKay* 176 Misc. 685, 686, 28 N.Y.S.2d 327 (N.Y.Sup.1941).

Fortunately, our society has advanced beyond the point when calling for help when having suicidal feelings is considered degrading. Malkus's report to Florida officials was not inherently defamatory, so no claim of slander cannot be sustained.

## 4. False Imprisonment

Matthews's fourth cause of action is that of false imprisonment. Her claim is that Malkus's telephone calls to Florida after speaking with Matthews "directly set in motion that which led plaintiff to be falsely imprisoned and depraved of blessed liberty." Cplt. at ¶ 103. Presumably, Matthews is referring to the Florida police officers' decision to take Matthews to a hospital for psychological evaluations.

■ In order to prevail on a claim for false imprisonment, it must be established that *Malkus* intended to confine Matthews, that Matthews was conscious of the confinement, that Matthews did not consent to such confinement, and that the confinement was not otherwise privileged. *See Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975), *cert denied sub nom., Schanbarger v. Kellogg*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975).

■ The first element of this claim—that Malkus intended to confine Matthews—finds no support in the record. After listening to the Matthews Tapes, it is clear beyond peradventure that Malkus did not suggest to anyone in Florida that Matthews be hospitalized. Malkus had nothing to do with any decision to send the police on the initial welfare check or with the actions taken by those officers. *See Matthews Tapes*. Malkus merely brought her suspicion of Matthews' "suicidal ideations" to the attention of local authorities. If the police then falsely imprisoned, Malkus was not the culprit—the police were.

■ But Matthews was not falsely imprisoned. Taking her to the hospital and keeping her there until a psychological evaluation could be completed did not constitute false imprisonment because the confinement was privileged. The power to restrain, summarily and without court process, may be exercised when "necessary to prevent the party from doing some immediate injury either to himself or others and only when the urgency of the case demands immediate intervention." *Warner v. State*, 297 N.Y. 395, 401, 79 N.E.2d 459 (1948); *see also Lauer v. State*, 57 A.D.2d 673, 674, 393 N.Y.S.2d 813 (3d Dep't., 1977) (finding that where there was "a substantial and genuine concern for [plaintiff's] physical and mental well-being" plaintiff's commitment could not form the basis for an action for false arrest). Because there existed a founded concern that Matthews might be suicidal, given her admitted statements to Malkus, her brief confinement for psychological evaluation was privileged.

## 5. False Light

Matthews' fifth claim is that Malkus's statements to the Florida authorities presented her in a "false light", that is, as being suicidal when she was not. Cplt. at ¶ 108.

■ "False light" is a subset of injury for the tort of invasion of privacy. Under New York law, invasion of privacy based on publicity which placed Matthews in false light is not a cognizable claim. *See Kane v. Orange County Publications*, 232 A.D.2d 526, 528, 649 N.Y.S.2d 23 (2d Dep't., 1996) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 123, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993); *Cruz v. Latin*

*News Impacto Newspaper*, 216 A.D.2d 50, 627 N.Y.S.2d 388 (1st Dep't., 1995)).

### 6. Invasion of Privacy/Trespass

Matthews' sixth claim is for invasion of privacy/trespass. Parsing her claims reveals two separate causes of action. The first is that Malkus "caused law enforcement to be sent out to the privacy and sanctity of plaintiff's own condominium home." Cplt. at ¶ 114. The second is that "plaintiff believed that her telephone call was private, privileged, and respected." Id. at ¶ 118. I address these two claims separately.

#### A. Trespass

■ The requisite elements for a claim of trespass are the intentional entry by defendants on to plaintiffs' land and the wrongful use without justification or consent. *See Augeri v. Roman Catholic Diocese of Brooklyn*, 225 A.D.2d 1105, 1106, 639 N.Y.S.2d 640 (4th Dep't., 1996). For several reasons, this cause of action is without merit.

■ First, neither defendant ever entered Florida, much less Matthews's property or home, so no claim for trespass lies against them. Furthermore, assuming defendants could be held liable for the actions of the Florida police (which they cannot), the police did not trespass. The police officers entered Matthews' property for the discrete and justified purpose of checking on her welfare following her phone call to a crisis hotline in which she expressed a desire to die. This is not trespass. *See People v. Burr*, 124 A.D.2d 5, 8, 510 N.Y.S.2d 949 (4th Dep't., 1987) (citing *Steagald v. United States*, 451 U.S. 204, 221, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (holding police may enter one's home under "exigent circumstances")).

### B. Breach of Privacy

■ Matthews also claims that Malkus's statements to the Pinellas police was a breach of Matthews's right of privacy. But New York does not recognize a common-law right to privacy. *Messenger v. Gruner and Jahr Printing and Publishing*, 94 N.Y.2d 436, 441, 706 N.Y.S.2d 52, 727 N.E.2d 549 (2000) (citing *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902)). A limited statutory right of privacy does exist, but only covers the use of one's "name, portrait, picture, or voice ... for advertising purposes or for the purposes of trade without the written consent first obtained." *Messenger*, 94 N.Y.2d at 441, 706 N.Y.S.2d 52, 727 N.E.2d 549. Matthews does not allege that her name, voice, or likeness was used by either defendant for any type of advertising or trade purpose.

### 7. Section 1983 Claims

Matthews claims that her First and Fourth Amendment rights were violated by the defendants. They were not.

#### A. First Amendment Claim Against Malkus

Matthews claims that her statement of "I wish I were dead" is "protected free speech and should *never* be given a diagnosis ... [y]et defendants both took out of context and twisted five words of plaintiff into something other than what those five words were; and by so doing and then falsely reporting to Florida defendants not only took away plaintiff's freedom of speech but viciously and recklessly misused plaintiff's five words against plaintiff and to cause harm to plaintiff." Cplt. ¶¶ 133, 135.

■ There are no facts on the record from which this Court can infer any violation of Matthews's right to free speech. Matthews claims that she had a constitu-

tional right to say, "I wish I were dead." So she did. But plaintiff does not contend that Malkus restricted her speech. She claims only that Malkus misconstrued what she (Matthews) was saying. Unfortunately for plaintiff, she enjoys no constitutional right to have her speech understood in any particular way. Therefore, no constitutional violation occurred when Malkus construed plaintiff's admitted words literally and took action as a result.

### B. Fourth Amendment Claim Against Malkus

██ Matthews also claims that she was unlawfully "seized and taken against her will from her home: law enforcement came to plaintiff's own home and took plaintiff into custody." Cplt. ¶ 136. Her allegation is that this unlawful seizure by two officers from the Pinellas Police Department was a direct result of Malkus' phone call to the Florida authorities. But there is no evidence that Malkus either seized plaintiff or directed the Florida police to take her from her home. As discussed above, Matthews cannot hold defendants responsible for the independent actions of the Pinellas police.

### C. Claim Against the Westchester County Medical Center

Respondeat superior does not form a basis for employer liability under Section 1983, and since Malkus did nothing unconstitutional, there is no basis for assertion of a *Monell* claim against the Medical Center.

### 8. Intentional Infliction of Emotional Distress and/or Negligent Infliction of Emotional Distress.

Finally, defendants urge that Matthews' claims for infliction of emotional distress be summarily dismissed. They are.

### A. Intentional Infliction

██ Matthews claims "[d]efendants' conducts was extreme, outrageous, unreasonable, negligent, reckless, oppressive, wanton, malicious, unprofessional, careless, uncaring, vicious, spiteful, harmful, limited, lacking insight, lacking thoroughness, narcissistic, insensitive, callous, projective, and/or tortious." Cplt. ¶ 141. Regardless of the specific terms used to describe the defendants, in order for Matthews to succeed on the highly disfavored claim for intentional infliction of emotional distress, she must show the following four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Company, Inc.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). "The requirements of the rule are rigorous, and difficult to satisfy." *Id.* at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (internal quotes and citation omitted). " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* (quoting *Murphy v. American Home Products Corporation*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)); *see also A. Brod, Inc. v. Worldwide Dreams, L.L.C.*, 2004 WL 1563352, 2004 N.Y. Slip Op. 50733 (N.Y.Sup.2004).

██ None of the facts as alleged by the plaintiff include any actions by Malkus or her employer that qualify as "extreme or outrageous." At the heart of Matthews's complaint is Malkus's alleged misinterpretation of Matthews' admitted statement that she wanted to die. Malkus's perception may have been wrong, but

her decision to act as though Matthews meant what she said, and to protect plaintiff from self-inflicted harm, is the antithesis of "extreme or outrageous" conduct.

## B.   Negligent Infliction

■ A cause of action for negligent infliction of emotional distress must be premised upon the breach of a duty owed to plaintiff which either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety. *See E.B. v. Liberation Publs., Inc.,* 7 A.D.3d 566, 566, 777 N.Y.S. 133 (2d Dep't.2004); *Johnson v. New York City Bd. of Educ.,* 270 A.D.2d 310, 312, 704 N.Y.S.2d 281 (2d Dep't.2000). Matthews has not alleged any duty that Malkus or the Westchester County Medical Center could have owed her. Matthews was certainly not owed a duty to be interpreted exactly as she wanted. Nor did Malkus owe Matthews a duty to keep her statements private. *See Clark v. Elam Sand and Gravel, Inc.,* 4 Misc.3d 294, 296, 777 N.Y.S.2d 624 (N.Y.Sup.2004) (citing *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)) (holding there is no common law duty to protect another's privacy). Since Matthews was owed no duty by defendants, a claim for negligent infliction of emotional distress cannot be sustained.

■ Furthermore, just as in a cause of action for intentional infliction of emotional distress, negligent infliction of emotional distress must be supported by allegations of conduct by the defendants " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' " *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (quoting Restatement [Second] of Torts § 46, Comment d); *see also Sheila C. v. Povich,*

11 A.D.3d 120, 130–131, 781 N.Y.S.2d 342 (1st Dep't., 2004); *Acquista v. New York Life Ins. Co.,* 285 A.D.2d 73, 83, 730 N.Y.S.2d 272 (1st Dep't., 2001); *Dillon* 261 A.D.2d at 41, 704 N.Y.S.2d 1; *Acquista v. New York Life Ins. Co.,* 285 A.D.2d 73, 83, 730 N.Y.S.2d 272 (1st Dep't., 2001). Such extreme and outrageous conduct must be clearly alleged in order for the complaint to survive a motion to dismiss. *Dillon, supra* at 41, 704 N.Y.S.2d 1; *see also Sheila C. v. Povich, supra* at 130–131, 781 N.Y.S.2d 342. For the reasons outlined above—that plaintiff does not allege any actions by defendants that could reasonably be deemed "extreme and outrageous."

## Conclusion

For the aforesaid reasons, none of Plaintiff's claims can survive this motion for summary judgment. Accordingly, defendants' motion for summary judgment is GRANTED as to all claims. The clerk of the court is ordered to close this case.

This constitutes the order and decision of the court.